# STATE OF CONNECTICUT *v.* DAVID M. POLLITT
## (12360)
## (12361)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and GLASS, Js.

Argued June 10—decision released August 25, 1987

*William F. Dow III,* for the appellant (defendant in each case).

*C. Robert Satti, Sr.,* state's attorney, for the appellee (state).

SHEA, J. The principal issue in these appeals is whether the trial court properly granted the state's motion that the two informations against the defendant, David M. Pollitt, be tried together. One information charged that the defendant, while in the town of Waterford on or about February 4, 1982, had committed the crimes of attempted sexual assault in the first degree, in violation of General Statutes §§ 53a-49 and 53a-70 (a), burglary in the first degree, in violation of General Statutes § 53a-101 (a) (2), and unlawful restraint in the first degree, in violation of General Statutes § 53a-95 (a). The second information accused the defendant of having committed, on or about April 15, 1982, in the town of Old Lyme, the crimes of sexual assault in the first degree, in violation of § 53a-70 (a), burglary in the first degree, and robbery in the third degree, in violation of General Statutes § 53a-136. After a trial to a jury of six, the defendant was found guilty of all counts and sentenced to a total term of twenty-eight years. In these appeals from the judgments of conviction, we find no error.

With respect to the charges arising from the Waterford incident, the jury could reasonably have found the following facts. The victim, an eighteen year old girl, resided with her mother and brother in a single family house in a rural wooded area of Waterford. On Thursday, February 4, 1982, the victim arrived home from work shortly before 3:30 p.m. While checking her mailbox, which was next to the road, the victim observed a blue pickup truck pass by at a slow rate of speed and saw the driver looking out the rear window at her. Soon after she had entered the house, the victim heard her front doorbell ring. When she opened the door, she saw the man who had been driving the truck standing there holding the storm door open. The victim testified that the man appeared to be in his early thirties, "had brown

hair, a beard, a mustache . . . was a little heavy-set, about five-eight [and] had on jeans and a flannel shirt and workboots.''

The assailant asked the victim if anyone was home. When the victim responded, ''No, no one's home,'' the assailant stepped into the house, grabbed the victim's right arm, and twisted it behind her back. The victim began screaming and crying. After pushing her down the hallway and into a bedroom, the assailant put a pillowcase over the victim's head and pulled down her pants. At that point, a noise at the back door made by the victim's brother startled the assailant, who immediately ran down the hallway and out the front door. The victim's brother chased the assailant down the road, saw him get into a ''blue truck'' ''and take off, hit first gear and burnout and hit second gear and chirped the tires.''

On April 21, 1982, the victim positively selected the defendant's photograph from a display of eight photographs. At trial the victim made an in-court identification of the defendant as her assailant, having ''[no] question about that in [her] mind.''

The jury could reasonably have found the following facts regarding the incident in Old Lyme. The victim lived with her husband and four young children in a single family house in a rural wooded area of Old Lyme. On Thursday, April 15, 1982, the victim returned home at about 4:30 p.m. from doing some errands. She allowed her thirteen year old son, who had been babysitting, to go outside to play with the other children, while her two year old baby slept upstairs. A few moments later, as the victim was lifting a plant into a basket in her living room, she ''heard a creak in the front hall.'' She looked up and saw a man standing at the entrance to the living room. The man appeared to be ''five-ten, approximately between 180 and 200 pounds, white,

with a thick but neatly-trimmed beard, late twenties, early thirties." The man was wearing "a faded blue plaid work shirt, blue jeans, workboots, and . . . very dark glasses."

The assailant walked into the living room and asked, "[I]s this the Smith residence?" After responding that she "didn't know anyone named Smith," the victim tried to leave the living room by walking around the assailant. The assailant grabbed the victim's right wrist and twisted her arm behind her back. He then asked the victim if they were alone. When she responded, "Yes," he pushed her down a hallway, through the kitchen, and into the family room, where he noticed a purse on the coffee table. After forcing the victim to retrieve her wallet from her purse with her free hand, the assailant took "the $20 bill that was in there and he stuffed it into his pocket."

The assailant next pushed the victim into the dining room and, insisting that he needed "security" that the victim would not follow him, ordered her to take off her clothes. Not deterred by her screams, the assailant himself removed the victim's clothes and then forced her to have sexual relations with him. The assailant eventually fled from the house through a sliding glass door that opened from the family room onto a patio. Intent upon seeing where the assailant was going, the victim "watched him run down through the wooded part and across the road, and . . . saw him get into a dark pickup truck . . . ."

At trial the victim made an "absolutely positive" in-court identification of the defendant as her assailant. She also testified that, at Westbrook police headquarters on July 1, 1982, she had "positively" selected the defendant from a lineup of six white males, each wearing dark glasses and having neatly-trimmed beards and mustaches.

The defendant's alibi defense in the Waterford case was that, as an employee of Amtrak, he had been at work near the railroad station in New London until at least 3:40 p.m. on February 4, 1982. The assault upon the victim had occurred at about 3:30 p.m., approximately seven miles away. In the Old Lyme case, the victim had been assaulted on April 15, 1982, between 4:35 and 4:50 p.m. The defendant testified that, on that date, he had worked overtime at the railroad station in New London until 4 p.m., at which time he had driven straight to his home in Clinton. He had arrived home, he stated, at 4:50 p.m. and had discovered a note from his wife that she was visiting friends, a jeweler and his wife. According to the defendant, he next called his wife, spoke also to the jeweler, who "wanted [him] to come up," and then drove to the jeweler's house. When asked on direct examination at what time the defendant arrived at his home, the jeweler responded, "I'm really not one hundred percent sure . . . but I think it was around ten minutes after 5 p.m."[1]

In these appeals the defendant claims that the trial court erred in (1) ordering that the two informations against the defendant be jointly tried, (2) restricting the defendant's voir dire examination of prospective jurors, and (3) allowing testimony by third parties that repeated the victims' versions of the incidents. With respect to his conviction of the crimes occurring in Waterford, the defendant claims additionally that the court erred in (4) denying his motions and requests relating to the pretrial hypnotizing of the victim by the police, (5) allowing testimony about the victim's "911 call" to the police, although the tape recording of that call had been destroyed, and (6) admitting into evidence a tire taken from the defendant's vehicle. In his appeal from his convictions arising from the assault in Old

---

[1] Our discussion below in part VII, infra, concerns a portion of the state's rebuttal of this alibi defense in the Old Lyme case.

Lyme, the defendant further claims that the court erred in (7) permitting the state to offer opinion evidence of the defendant's bad character, and (8) admitting into evidence the defendant's dark safety glasses.

I

The defendant first claims that the trial court erred in joining the Waterford and Old Lyme cases for trial. In granting the state's motion for consolidation pursuant to Practice Book § 829[2] and General Statutes § 54-57,[3] the court found that, because there was "a substantial probability that certain evidence in each case may be admissible in the other on the issues of identification and intent . . . a joint trial would [not] substantially prejudice the rights of the defendant." The court further asserted that "the cases can be kept separate." The court accordingly denied the defendant's subsequent motions for severance.

Pursuant to § 829 and § 54-57 a trial court may order a joint trial of charges involving offenses of the same character. Section 829, however, should be read in the light of Practice Book § 828, which permits severance "[i]f it appears that a defendant is prejudiced by a joinder of offenses . . . . " See State v. King, 187 Conn. 292, 296, 445 A.2d 901 (1982); L. Orland, Connecticut Criminal Procedure (1976) pp. 177–78. Similarly, in construing § 54-57, we have stated that the question of severance lies within the discretion of the

---

[2] "[Practice Book] Sec. 829.—TRIAL TOGETHER OF INDICTMENTS OR INFORMATIONS

"The judicial authority may, upon his own motion or the motion of any party, order that two or more indictments or informations or both, whether against the same defendant or different defendants, be tried together."

[3] "[General Statutes] Sec. 54-57. JOINDER OF OFFENSES OF THE SAME CHARACTER. Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise."

trial court, which should not be interfered with unless it has been manifestly abused. *State* v. *Jonas,* 169 Conn. 566, 570, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976). "The discretion of a court to order separate trials should be exercised only when a joint trial will be substantially prejudicial to the rights of the defendant, and this means something more than that a joint trial will be less than advantageous to the defendant." *State* v. *Silver,* 139 Conn. 234, 240, 93 A.2d 154 (1952). "[A]n accused bears a heavy burden to show that the denial of severance resulted in substantial injustice . . . ." *State* v. *King,* supra, 302; see also *United States* v. *Morrow,* 537 F.2d 120, 134 (5th Cir. 1976), cert. denied sub nom. *Martin* v. *United States,* 430 U.S. 956, 97 S. Ct. 1602, 51 L. Ed. 2d 806 (1977); *State* v. *Schroff,* 198 Conn. 405, 408–409, 503 A.2d 167 (1986); *State* v. *Rodgers,* 198 Conn. 53, 63, 502 A.2d 360 (1985).

Substantial prejudice does not necessarily result from a denial of severance even where evidence of one offense would not have been admissible at a separate trial involving the second offense. A trial court will not have manifestly abused its discretion in denying severance if the state's orderly presentation of evidence has prevented confusion of the jury and has enabled the jury to consider the evidence relevant to each charge separately and distinctly. See *Drew* v. *United States,* 331 F.2d 85, 89 (D.C. Cir. 1964); *State* v. *Bell,* 188 Conn. 406, 411, 450 A.2d 356 (1982); *State* v. *King,* supra, 301. Where evidence of one incident *can* be admitted at the trial of the other, separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. See generally *State* v. *Pierce,* 474 A.2d 182, 185 (Me. 1984).

Because of its prejudicial impact, evidence of prior acts of misconduct is inadmissible merely to show a defendant's bad character or tendency to commit criminal acts. *Spencer* v. *Texas,* 385 U.S. 554, 560–61, 87 S. Ct. 648, 17 L. Ed. 2d 606, reh. denied, 386 U.S. 969, 87 S. Ct. 1015, 18 L. Ed. 2d 125 (1967); *State* v. *Howard,* 187 Conn. 681, 684, 447 A.2d 1167 (1982). On the other hand, such evidence may be offered in proof of an issue in the case, such as intent, identity, malice, motive or a system of criminal activity. See *State* v. *Falby,* 187 Conn. 6, 23, 444 A.2d 213 (1982); *State* v. *Barlow,* 177 Conn. 391, 393, 418 A.2d 46 (1979). The trial court must still consider whether the probative value of the evidence outweighs its prejudicial impact. See *United States* v. *Wesevich,* 666 F.2d 984, 988–89 (5th Cir. 1982); *State* v. *Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982). Because of the difficulties inherent in such a balancing process, the court's determination will be overturned only if it manifests a clear abuse of discretion. See *State* v. *Tucker,* 181 Conn. 406, 416, 435 A.2d 986 (1980); *State* v. *Turcio,* 178 Conn. 116, 129, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980).

It is undisputed that the determinative issue at trial in each of the present cases was the identity of the victim's assailant. Case law has established that, on the issue of identity, the probative value of evidence of other crimes or misconduct of an accused outweighs its prejudicial impact "where the methods used are sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other." *State* v. *Ibraimov,* supra, 354; see also *United States* v. *Woods,* 613 F.2d 629, 635 (6th Cir.), cert. denied, 446 U.S. 920, 100 S. Ct. 1856, 64 L. Ed. 2d 275 (1980); *State* v. *Rogers,* 199 Conn. 453, 459–60, 508 A.2d 11 (1986); *State* v. *Mandrell,* 199 Conn. 146, 151–52, 506 A.2d 100 (1986). Much more is required

than the mere repeated commission of crimes of the same class. "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." C. McCormick, Evidence (3d Ed. 1984) § 190, p. 560; see also *State* v. *Higgins,* 201 Conn. 462, 470, 518 A.2d 631 (1986).

In arguing that the crimes in Waterford and Old Lyme did not constitute "signature offenses," the defendant relies primarily upon this court's decision in *State* v. *Ibraimov,* supra. The young victim in *Ibraimov* had entered her assailant's automobile in order to respond to his request for directions. The assailant then drove the victim to a remote area where he sexually assaulted her. Subsequently, the assailant picked up another young female, who had been hitchhiking, and offered her money to have sexual relations with him. Because the central issue at trial in *Ibraimov* was the identity of the assailant, the state proffered testimony of a sixteen year old girl that, more than two months after the date of the crimes charged, she had entered the defendant's automobile when he offered her a ride. This witness, who had met the defendant previously, was driven by him to a remote area, where he made sexual advances and offered her money, marijuana and something to drink. See id., 350–51. We held that the admission of this evidence, because of its prejudicial character, had been erroneous. The assailant's crime and the defendant's subsequent misconduct could not be deemed signature offenses, we concluded, because "[t]he number of times that young girls have been induced to enter automobiles upon similar pretexts and with similar consequences is just too great according to general experience to narrow the circle of possible suspects significantly." Id., 354.

Arguing that the present cases are distinguishable from *Ibraimov,* the state urges that a more relevant precedent is *State* v. *Howard,* supra, in which we held

that the two incidents at issue in that case were suffi-
ciently similar and distinctive to warrant admission of
the prior misconduct evidence. See *State* v. *Howard,*
supra, 687. The victim in *Howard* had been walking
home when a man approached and passed her, reversed
direction, drew parallel to her, and spoke with her
briefly. He then grabbed her neck from behind, placed
a brown knife at her throat, forced her backward into
a wooded area and sexually assaulted her. At trial the
court admitted evidence of a previous attempted sex-
ual assault allegedly committed by the defendant two
years prior to the charged crimes. The victim of that
prior incident testified that, as she was walking in a
nature center with a five year old boy, the defendant
had passed her, saying "Hi," and then had turned and
approached her from the rear. Grabbing her neck from
behind, the defendant had allegedly placed a brown
knife to her throat, forced her into some bushes, and
ordered her to remove her clothes. The defendant had
fled, however, when the child started to cry. See id.,
683–84. We concluded in *Howard* that "the striking
similarities between the two incidents" rendered the
prior misconduct evidence "particularly probative on
the issue of identity." Id., 687–88. We noted addition-
ally that the defendant's proffering of an alibi defense
was an "additional distinction from *Ibraimov* ren-
der[ing] the challenged evidence more probative
. . . ." Id., 687.

In the present cases, as in *Howard,* the defendant
presented alibi defenses, which, if believed, would have
precluded findings that the defendant had committed
the crimes charged. Because the issue of identity was
therefore critical, the evidence that the assailant in each
incident had acted in a manner and under circum-
stances having marked similarities was especially
probative in each case. We note that each offense
occurred on a Thursday in the late afternoon. The vic-

tims lived in single family residences in wooded areas, and had returned home immediately before the assaults. The assailant in each incident initially asked his victim whether they were alone and, when assured no one else was home, grabbed her right arm and twisted it behind her back. Rather than initiate the sexual assault in the room where he had grabbed her, the assailant forced each victim through various parts of the house before removing her clothes. In each case the assailant was about thirty years old, between five feet, eight inches and five feet, ten inches tall, relatively heavy-set and bearded. Additionally, each assailant wore jeans, a work shirt and workboots and fled in a dark blue pickup truck. In each case, moreover, there was evidence that, as the truck started up from where it had been parked, one of its tires left a distinctive impression in the road surface, a mark found to correspond with a tread defect on a tire of the defendant's dark blue pickup truck.

We conclude that the circumstances of the assaults in Waterford and Old Lyme were sufficiently similar and distinctive to constitute "signature offenses." As in *Howard*, we are not dissuaded from this conclusion by the fact that one incident involved a completed sexual assault while the other involved merely an attempt. The unusual pattern and characteristics of the assaults rendered evidence of each incident admissible at the trial of the other. Because the defendant consequently was not substantially prejudiced by joinder of the offenses for a single trial, we hold that the trial court did not err in granting the state's motion for consolidation.[4]

---

[4] This case is plainly distinguishable from our recent decision in *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), in which we found prejudicial error in the joint trial of four wholly unrelated offenses. There the state conceded that the evidence of each offense would not have been admissible at the trial of the others if the charges had been tried separately. The state has made no such concession in this appeal but claims to the contrary.

## II

The defendant next claims that the trial court erred in restricting the scope of the voir dire examination by prohibiting defense counsel from asking prospective jurors the following question: "Do you believe that there is such a thing as mistaken identification?" The defendant argues that, because a necessary correlate of his alibi defenses was the claim that the victims' identifications of him as their assailant had been mistaken, the court's ruling prevented him from uncovering significant prejudice that might have existed in the jurors' minds.

Section 19 of article first as amended by article IV of the amendments to the constitution of Connecticut, states in part: "The right of trial by jury shall remain inviolate . . . . In civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate." See *State v. Marsh,* 168 Conn. 520, 521, 362 A.2d 523 (1975); see also *Lamb* v. *Burns,* 202 Conn. 158, 162, 520 A.2d 190 (1987). Further, General Statutes § 54-82f provides in part: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto." We have stated that, as a practical matter, the wide range of cases submitted to juries, along with the attendant impossibility of establishing a set pattern of voir dire questions, requires that the trial court be vested with broad discretion in determining the extent of the voir dire examination. See *State* v. *Hernandez,* 204 Conn. 377, 381, 528 A.2d 794 (1987); *State* v. *Dolphin,*

203 Conn. 506, 511–12, 525 A.2d 509 (1987). Therefore, the court's rulings ordinarily will not be disturbed unless the court has clearly abused its discretion or it appears that prejudice to one of the parties has resulted. *State* v. *Dahlgren,* 200 Conn. 586, 601, 512 A.2d 906 (1986); *State* v. *Rogers,* 197 Conn. 314, 318, 497 A.2d 387 (1985).

In this case the court sustained the state's objection to the question asked of a prospective juror whether he believed "that there is such a thing as mistaken identification?" The court explained that "the use of the term 'mistaken identification' is perhaps a little too specific and might be getting into some matters that might be specifically covered in the trial." Defense counsel, nevertheless, was permitted to ask questions of prospective jurors such as the following: "Would you automatically believe every witness who testified?" "[Do you] think . . . that a person who takes an oath can be honestly mistaken about what they're testifying about?" "If [the judge] told you that one of the things that the State had to prove beyond a reasonable doubt was the identity or identification and if he gave you instructions on that subject matter, would you follow his instructions?" "If the Judge were to tell you . . . [a]libi is recognized as a proper defense and you should consider this, that, and the other, would you follow what the Judge told you?"

This court has asserted that, "if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. . . . " *State* v. *Higgs,* 143 Conn. 138, 142, 120 A.2d 152 (1956); see also *State* v. *Rogers,* 197 Conn. 314, 318, 497 A.2d 387 (1985). The latitude thus afforded the parties in order that they may accomplish the purposes of the voir dire is tempered by the rule

that "[q]uestions addressed to prospective jurors involving assumptions or hypotheses concerning the evidence which may be offered at the trial . . . should be discouraged . . . . [A]ll too frequently such inquiries represent a calculated effort on the part of counsel to ascertain before the trial starts what the reaction of the venireman will be to certain issues of fact or law or, at least, to implant in his mind a prejudice or prejudgment on those issues. Such an effort transcends the proper limits of the voir dire and represents an abuse of the statutory right of examination." *State* v. *Mendill,* 141 Conn. 360, 362–63, 106 A.2d 178 (1954); see also *State* v. *Clark,* 164 Conn. 224, 226, 319 A.2d 398 (1973).

We conclude that the trial court did not abuse its discretion in attempting to strike a proper balance between these competing considerations. By prohibiting the voir dire question posed by defense counsel regarding "mistaken identification," the court may properly have endeavored to prevent a prejudicial assumption about the case from infecting the jury. The questions nevertheless permitted by the court regarding witness credibility, honest mistake, identification and alibi were adequate alternatives for discerning whether prejudice existed in the jurors' minds on those issues. Consequently, we hold that the court did not err in sustaining the state's objection to the voir dire question posed by defense counsel regarding mistaken identification.

### III

The defendant also claims that the trial court erred in each case in admitting the testimony of third persons regarding the details of the assaults as had been related to them by the victims. The state called the sister and a co-worker of the victim in the Waterford case, and the husband of the victim in the Old Lyme case,

to recount each complainant's version of the assault upon her. Contending that this evidence served principally to "inflame the jury," the defendant asserts that the court, in permitting such testimony, misapplied the "constancy of accusation" exception to the hearsay rule.

This court has recently reaffirmed the traditional rule in this jurisdiction that a witness to whom the victim of a sex-related offense has complained may testify not only to the fact that the complaint had been made but also to its details. See *State* v. *Dabkowski,* 199 Conn. 193, 199, 506 A.2d 118 (1986); see also *State* v. *Segerberg,* 131 Conn. 546, 549, 41 A.2d 101 (1945); *State* v. *Kinney,* 44 Conn. 153, 156 (1876). When the victim has testified in court to the facts of the alleged incident, as in the present cases, such evidence is received to show constancy in the victim's declarations. See *State* v. *Brice,* 186 Conn. 449, 453, 442 A.2d 906 (1982); *State* v. *DeWolf,* 8 Conn. 93, 100 (1830).

The defendant argues that the constancy of accusation exception to the hearsay rule applies only when the witness making the accusation has been impeached by a suggestion of recent contrivance or fabrication. Because we conclude that such a suggestion is not a requisite to triggering this exception to the hearsay rule in sexual assault cases, we need not resolve the issue of whether the defendant did, in effect, raise the claim of fabrication at trial in either of the cases.[5]

Generally, hearsay evidence of prior consistent statements offered to corroborate the testimony of a witness is inadmissible at trial. See *Thomas* v. *Ganezer,*

[5] The state asserts that the claims of the defendant at trial in the Waterford case regarding the hypnotizing of the victim, which we discuss in part IV, infra, of this opinion, effectively raised the issue of recent fabrication on the part of that victim. The defendant claimed that, because the victim had been hypnotized, much of her testimony resulted from "confabulation [and] pseudomemory."

137 Conn. 415, 417, 78 A.2d 539 (1951); C. McCormick, supra, § 251. Exceptions to this general rule exist most notably when the prior consistent statement is offered to rehabilitate a witness who has been impeached by a prior inconsistent statement; e.g., *State* v. *McCarthy,* 179 Conn. 1, 18–21, 425 A.2d 924 (1979); by the suggestion of a bias arising subsequent to the time of the prior consistent statement; e.g., *State* v. *Dolphin,* 178 Conn. 564, 571–72, 424 A.2d 266 (1979); or by a claim of recent contrivance. See generally *State* v. *Brown,* 187 Conn. 602, 608, 447 A.2d 734 (1982).

This court has analyzed constancy of accusation evidence in sexual assault cases as prior consistent statements admissible to rebut a suggestion of recent fabrication. See *State* v. *Ouellette,* 190 Conn. 84, 98–99, 459 A.2d 1005 (1983). We have stated that where a sexual assault has been alleged, however, "the trial court may *presume* . . . that the victim is impeached by a suggestion of recent contrivance." (Emphasis added.) Id., 99. Our early case law attempts to set forth the traditional rationale underlying this presumption: "If a female testifies, that such an outrage has been committed on her person, an enquiry is, at once, suggested, why it was not communicated to her . . . friends. To satisfy such inquiry, it is reasonable that she should be heard in her declarations, that she did so communicate it, and that testimony should be received to confirm her story." *State* v. *DeWolf,* supra, 99. "[S]uch a course [of conduct] would be natural if the crime had been committed, but very unnatural if it had not been." *State* v. *Kinney,* supra.

We have noted that, while our legislature in 1974 repealed General Statutes § 53a-68, which required corroboration of the testimony of the victim of an alleged sexual assault as a prerequisite to any conviction for the offense, the legislature has taken no incidental action to annul or restrict the constancy of accusation

exception to the hearsay rule. See *State* v. *Dabkowski,* supra, 200–201. We conclude that, because the trial court's application of that exception comported with settled law, the court did not err in permitting the state to offer corroborative testimony regarding the assaults from witnesses to whom the victims had complained.

## IV

In his appeal from his conviction of the crimes occurring in Waterford, the defendant raises various claims of error relating to the posthypnosis testimony of the victim. In the week following the February 4, 1982 assault, Waterford police officers solicited the victim's permission to be questioned about the incident while under hypnosis, to which the victim agreed. The officers hoped that the victim would be able to recall the license plate number on her assailant's pickup truck, which she might have seen while at her mailbox prior to the assault. Because the Waterford police station was then undergoing renovations, the February 10, 1982 hypnosis session was held at the victim's home. Richard DeNoia, a Waterford police detective who had taken a ten week course on hypnosis, conducted the hypnotic interview. Stewart Clark, also a detective, did not participate in the questioning but was present during the session. While the victim was under hypnosis she was distracted by the ringing of the telephone and by her mother's arrival at home. The trial court found that the hypnotic interview was not recorded on tape or video.

At the time of the hypnotic session, the Waterford police department had formulated no rules or procedures for the use of hypnosis in the investigation of crimes. Recently, in *Rock* v. *Arkansas,* 483 U.S.    , 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987), the United States Supreme Court addressed the issue of the constitutionality of the per se rule enunciated by the Supreme Court

of Arkansas excluding a criminal defendant's hypnotically refreshed testimony.[6] See *Rock* v. *State,* 288 Ark. 566, 708 S.W.2d 78 (1986). While ruling that such a per se rule infringes impermissibly on the right of a defendant to testify on his own behalf, the United States Supreme Court in *Rock* stressed that "[t]he popular belief that hypnosis guarantees the accuracy of recall is as yet without established foundation . . . . The most common response to hypnosis . . . appears to be an increase in both correct and incorrect recollections." *Rock* v. *Arkansas,* supra, 2713; see generally M. Orne, Hypnotically Induced Testimony in Eyewitness Testimony: Psychological Perspectives (G. Wells & E. Loftus, eds., 1985) p. 171; B. Diamond, "Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness," 68 Calif. L. Rev. 313, 333–42. (1980).

The court in *Rock* v. *Arkansas,* supra, next delineated certain procedural safeguards that might reduce the inaccuracies associated with hypnotically induced testimony. First, the hypnosis should be performed "only by a psychologist or psychiatrist with special training in its use and who is independent of the investigation." Id., 2714. Second, in order to reduce the potential for suggestiveness, the hypnosis should be conducted "in a neutral setting with no one present but the hypnotist and the subject." Id. The court stated finally that "[t]ape or video recording of all interrogations, before, during, and after hypnosis, can help reveal if leading questions were asked." Id.; see generally *Sprynczynatyk* v. *General Motors Corporation,* 771 F.2d 1112, 1122–23 (8th Cir. 1985); *House* v. *State,* 445

[6] In a footnote the United States Supreme Court stated: "This case does not involve the admissibility of testimony of previously hypnotized witnesses other than criminal defendants and we express no opinion on that issue." *Rock* v. *Arkansas,* 483 U.S. , 107 S. Ct. 2704, 2712 n.15, 97 L. Ed. 2d 37 (1987).

So. 2d 815, 826–27 (Miss. 1984); *State* v. *Hurd,* 86 N.J. 525, 432 A.2d 86 (1981); *State* v. *Weston,* 16 Ohio App. 3d 279, 287, 475 N.E.2d 805 (1984).

It is clear that the procedural safeguards outlined by the United States Supreme Court in *Rock* for reducing any unreliability of posthypnosis testimony were not adhered to in the present case. The state concedes that the methods used by the officers were inadequate. It is in the light of these deficiencies in the hypnosis procedure that the defendant claims error. Specifically, the defendant claims that the trial court erred in (a) allowing the Waterford victim to testify, (b) refusing to strike her testimony about her assailant's workboots, (c) denying the defendant's request that the victim be examined to determine the effects of the hypnosis, and (d) denying his request to charge regarding hypnosis.

Because the defendant's first two claims regarding hypnosis are analytically similar, we will address them jointly. The trial court denied the defendant's pretrial motion in limine to exclude the entire testimony of the victim. It later denied his request at trial to strike that portion of her testimony concerning her assailant's workboots. On appeal the factual contention of the defendant is that the victim's recollection of the workboots was the product of "a 'pseudomemory' . . . created by the improper hypnosis." The defendant argues that this hypnotically-created memory deprived him of his constitutional due process and confrontation rights, because the victim could not have been effectively cross-examined about such a false memory.

Because we conclude that the defendant's factual presupposition is erroneous, we need not address the constitutional issues he has raised. See generally *Rescue Army* v. *Municipal Court,* 331 U.S. 549, 568–74, 67 S. Ct. 1409, 91 L. Ed. 1666 (1947); *Moore* v. *McNamara,* 201 Conn. 16, 20, 513 A.2d 660 (1986). The

defendant maintains that the victim recalled her assailant's workboots only following the hypnosis session. It is true that the victim did not include the boots in her description of the assailant given to an investigating police officer on February 4, 1982. Within minutes after the attempted sexual assault had occurred, however, the victim told her brother that her attacker had worn boots.[7] Further, in denying the defendant's motion in limine to exclude the victim's testimony, the trial court found that the statements given by the victim prior to the hypnotic interview were "almost identical in content with the information produced under hypnosis."

A number of jurisdictions have adopted the rule that a witness who has previously been hypnotized is competent to testify at trial where that testimony is consistent with his prehypnotic recollection. See *Contreras* v. *State,* 718 P.2d 129 (Alaska 1986); *Bundy* v. *State,* 471 So. 2d 9, 18–19 (Fla. 1985); *State* v. *Iwakiri,* 682 P.2d 571, 579 (Idaho 1984); *State* v. *Seager,* 341 N.W.2d 420 (Iowa 1983); *People* v. *Hughes,* 88 App. Div. 2d 17, 452 N.Y.S.2d 929 (1982); *Commonwealth* v. *DiNicola,* 348 Pa. Super. 405, 502 A.2d 606 (1985); *Hopkins* v. *Commonwealth,* 230 Va. 280, 337 S.E.2d 264 (1985), cert. denied, 475 U.S. 1098, 106 S. Ct. 1498, 89 L. Ed. 2d 898 (1986); *State* v. *Martin,* 101 Wash. 2d 713, 722–23, 684 P.2d 651 (1984); *State* v. *Armstrong,* 110 Wis. 2d 555, 329 N.W.2d 386 (1983). Finding this rule to be logically sound, we hold that the trial court did not err in denying both the defendant's motion in limine to exclude the victim's testimony and his subsequent request to strike her testimony regarding her assailant's workboots.

---

[7] Additionally, Virginia Miller, a Waterford police dispatcher, testified that she had received an emergency call from the victim on February 4, 1982, during which the victim "did refer to [her assailant's] boots, several times." Miller's testimony is discussed in part V, infra, of this opinion.

After the state had rested its opening case, the defendant made an oral motion for an examination of the victim by a psychologist trained in hypnotism. The defendant claims that the court erred in denying this motion and, consequently, deprived him of his right to establish a defense.

We note that "[t]he competency of a witness is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law." *State* v. *Manning,* 162 Conn. 112, 115, 291 A.2d 750 (1971); see *State* v. *Orlando,* 115 Conn. 672, 675, 163 A. 256 (1932). The defendant states that his purpose in seeking an examination of the victim was to "demonstrate that the complainant's memory had been altered by hypnosis . . . . " Because, as the trial court indicated, the statements of the victim before and after the hypnosis session were "almost identical in content," such an endeavor could have afforded the defendant no discernible benefit. Any expert opinion about "whether the hypnotic session had created a confabulation in the complainant's memory" would necessarily have been speculative. Cf. *State* v. *Piskorski,* 177 Conn. 677, 716–17, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). Thus, under the circumstances, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for an examination of the victim. Cf. *United States* v. *Pacelli,* 521 F.2d 135, 140–41 (2d Cir.), cert. denied, 424 U.S. 911, 96 S. Ct. 1106, 47 L. Ed. 2d 314 (1976).

We are similarly unpersuaded by the defendant's claim that the court erred in failing to charge the jury about hypnosis in accordance with his requests. Specifically, the defendant claims that the court failed to instruct the jury on "the danger of hypnosis and [to] provide a guidance for the jury in assessing the testimony of the complainant in light of the hypnotic experience."

Ordinarily there can be no error in a court's rejection of a request to charge that clearly does not meet the requirements of Practice Book § 854. See *State* v. *Hancich,* 200 Conn. 615, 622–23, 513 A.2d 638 (1986); *State* v. *McIntosh,* 199 Conn. 155, 158–61, 506 A.2d 104 (1986); cf. *Holbrook* v. *Casazza,* 204 Conn. 336, 353, 528 A.2d 774 (1987). That rule, which is entitled "Form and Contents of Requests," provides in part that requests to charge the jury "shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based, and the evidence to which the proposition would apply. Requests to charge should not exceed fifteen in number unless, for good cause shown, the court permits the filing of an additional number." Practice Book § 854.

The requests submitted by the defendant do not meet the criteria set forth in § 854. The defendant submitted a total of approximately fifty requests, which, as the trial court informed him, "is well beyond the normal." Additionally, such requests, including those dealing with hypnosis, are not "in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated . . . ." Practice Book § 854.

The content of the defendant's requests to charge dealing with hypnosis provides a further ground for their rejection by the court. These requests stress that "a false memory can be created" by hypnosis, and then list procedural safeguards similar to those enunciated by the United States Supreme Court in *Rock* v. *Arkansas,* supra. Immediately following that enumeration is the requested instruction that, "[i]f you find that one or more of these procedures was not followed, then you must presume that the testimony of [the victim] in the courtroom was the result of improper and

undue suggestion by the officers involved in that hypnotic session, and you must reject her testimony in its entirety."

In the light of the trial court's finding that the victim's version of the assault had not changed significantly following the hypnosis session, the court may properly have concluded that the defendant's requests on hypnosis did not adequately relate to the evidence. It would not have been correct to have required the jury to reject "in its entirety" posthypnotic testimony of the victim that was consistent with her prehypnosis statements. The court was therefore not in error in denying such requests to charge. See *State* v. *Chetcuti,* 173 Conn. 165, 171, 377 A.2d 263 (1977); *State* v. *Green,* 172 Conn. 22, 25, 372 A.2d 133 (1976).

Finally, the instruction actually given by the court with respect to the hypnotic interview of the victim included the following language: "There was testimony that during the course of the investigation [the victim] was hypnotized. Now, you heard the witness testify and you had an opportunity to observe her here on the stand and you had an opportunity to listen to her testimony.

"The hypnosis is merely a factor which you may consider based upon all of the evidence; and it is up to you to determine what credibility and what weight should be given her testimony."

The court's jury instruction, albeit terse, essentially comports with the rule adopted by several courts that hypnosis affects the credibility, but not the admissibility, of testimony. See, e.g., *Beck* v. *Norris,* 801 F.2d 242, 244–45 (6th Cir. 1986); *United States* v. *Awkard,* 597 F.2d 667, 669 (9th Cir.), cert. denied, 444 U.S. 885, 100 S. Ct. 179, 62 L. Ed. 2d 116 (1979); *State* v. *Wren,* 425 So. 2d 756 (La. 1983); *State* v. *Brown,* 337 N.W.2d 138, 151 (N.D. 1983); *State* v. *Glebock,* 616 S.W. 2d 897, 903–904 (Tenn. Crim. App. 1981); *Chapman* v. *State,*

638 P.2d 1280, 1282 (Wyo. 1982). Because we are not faced today with the issue of the admissibility of posthypnotic testimony that is *inconsistent* with the witness's statements made prior to an improperly conducted hypnosis session, we express no opinion on that matter. We conclude, however, that, under the circumstances of this case, the court's charge was correct in law and fairly presented the case to the jury in such a way that injustice was not done to either party. See *State* v. *Marra,* 195 Conn. 421, 443, 489 A.2d 350 (1985); see also *Holbrook* v. *Casazza,* supra, 351–52; *Atlantic Richfield Co.* v. *Canaan Oil Co.,* 202 Conn. 234, 240, 520 A.2d 1008 (1987). In sum, we hold that the court did not err in its rulings relating to the hypnotic interview of the victim in the Waterford case.

## V

Also with respect to the Waterford case, the defendant claims that the trial court erred in allowing testimony about the victim's "911" emergency call to the police although the tape recording of that call had been destroyed. At the trial, which occurred between November, 1982, and March, 1983, the state offered the testimony of Virginia Miller, a Waterford police dispatcher, about the call she had received from the victim on February 4, 1982, on the 911 emergency line. Miller's testimony included the following version of the description of the assailant given to her by the victim: "She said that he . . . had dark hair, mustache and a beard and wore boots . . . . Again, the man had a beard, mustache, sort of medium, maybe heavy-set, and she did refer to the boots several times."

The defendant objected to Miller's testimony on the ground that the tape recording of the victim's 911 emergency call was "the best evidence as to what was said."[8]

---

[8] The defendant has not pursued his "best evidence" objection on appeal. Such an objection would be unavailing because the best evidence rule does

Miller testified, however, that the recording could not be produced because the tape had been erased pursuant to routine police procedure. Although the defendant claims on appeal that the court erred "in refusing to strike testimony" regarding the 911 call, the defendant did not make a motion at trial to strike Miller's testimony. We note that Practice Book § 4185 clearly relieves this court of any obligation to consider a claim "not distinctly raised at trial." *State* v. *Rogers,* 199 Conn. 453, 461, 508 A.2d 11 (1986). Nevertheless, because of the recurrence and importance of the present issue; see *Riccio* v. *Abate,* 176 Conn. 415, 418 n.1, 407 A.2d 1005 (1979); and because both parties have briefed the issue; see *Scott* v. *General Iron & Welding Co.,* 171 Conn. 132, 139, 368 A.2d 111 (1976); we shall dispose of the defendant's claim on the merits.

The defendant contends that the harm he suffered as a result of the erasure of the tape recording required the exclusion of Miller's testimony from the record. See Practice Book § 755. In *State* v. *Myers,* 193 Conn. 457, 466, 479 A.2d 199 (1984), we held that the failure of the state to preserve and produce a witness's tape-recorded statement violated our rules of practice. See Practice Book § 752. Our decision in Myers was released on June 26, 1984, more than one year after the present defendant had been tried. Perhaps in light of this fact, the defendant has not claimed that the police destroyed the recording in bad faith.

In the absence of a showing of bad faith, this court has maintained that whether a witness's testimony should be stricken depends in large measure upon the amount of prejudice to the defendant that resulted from

not apply where the contents of a writing are only collaterally involved. C. Tait & J. LaPlante, Connecticut Evidence § 10.9. "Anyone who has heard an oral statement made and remembers it may testify to what was said." *State* v. *Moynahan,* 164 Conn. 560, 583, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973).

the failure of the state to make disclosable material available to him. See *State* v. *Shaw,* 185 Conn. 372, 386, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982), quoting *United States* v. *Miranda,* 526 F.2d 1319, 1329 (2d Cir. 1975), cert. denied, 429 U.S. 821, 97 S. Ct. 69, 50 L. Ed. 2d 82 (1976); see also *State* v. *Milum,* 197 Conn. 602, 617, 500 A.2d 555 (1985); *State* v. *Myers,* supra, 467. Because there exists no constitutional right of access to the statements of a witness for the prosecution, the burden of showing prejudice rests with the defendant. *State* v. *Mullings,* 202 Conn. 1, 8, 519 A.2d 58 (1987); *State* v. *Vessichio,* 197 Conn. 644, 662, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986).

The defendant's assertion of prejudice rests principally upon the notion that Miller's testimony "corroborated the complainant's claim that her trial memory [of her assailant's workboots] had not been affected by hypnosis." In addition to Miller's testimony, however, the victim's brother, as we have stated, testified that, immediately after the assault, the victim had referred to her assailant's boots. Standing alone, such testimony refuted the defendant's contention that the posthypnotic statements of the victim regarding the boots were the product of a hypnotically induced pseudomemory. Under the circumstances, we conclude that the defendant suffered no significant prejudice from the loss of the victim's 911 statement to Miller. Accordingly, we hold that the trial court did not err in allowing Miller's testimony about that statement.

## VI

A further contention of the defendant with respect to the Waterford case is that the court erred in admitting into evidence a tire seized from his truck nearly three months after the February 4, 1982 incident. In

fleeing from the victim's home, the assailant had driven hurriedly from the scene leaving tire burns on the roadway. A similar tire impression had been left on the roadway when the assailant fled after committing the Old Lyme offense, but the defendant has raised no claim of error with respect to the admission of the tire in relation to that incident. Photographs of the Waterford tire marks, as well as a preserved portion of the road, revealed that the right rear tire of the assailant's vehicle had a distinctive defect in the treads. The right rear tire taken from the defendant's truck, which was seized by the police on April 17, 1982, following the Old Lyme incident, showed a similar defect. David Paige, a tireprint expert at the state police forensic laboratory, testified at trial that he was 98 percent certain that the defendant's tire had left the tire marks near the victim's home.

The defendant argues that his tire should not have been admitted into evidence because "the State could not show that the tire was in substantially the same condition when seized as it would have been at the time of the crime, or even that it had been on the defendant's truck when the crime occurred." An object connected with the commission of a crime must be shown to be in substantially the same condition as when the crime was committed before it can be properly admitted into evidence. *United States* v. *Clark,* 425 F.2d 827, 833 (3d Cir. 1970); *State* v. *Johnson,* 162 Conn. 215, 232, 292 A.2d 903 (1972). "There is no hard and fast rule that the prosecution must exclude or disprove all possibility that the article or substance has been tampered with; in each case the trial court must satisfy itself in reasonable probability that the substance had not been changed in important respects. . . . The ruling of the trial judge may not be overturned except for a clear abuse of discretion." *State* v. *Johnson,* supra, 232–33; see also *United States* v. *Von Roeder,* 435 F.2d

1004, 1008 (10th Cir. 1971); *United States* v. *S.B. Penick & Co.,* 136 F.2d 413, 415 (2d Cir. 1943); *State* v. *Brown,* 163 Conn. 52, 57, 301 A.2d 547 (1972).

At trial the dealer who had sold the defendant his pickup truck testified that the defective tire marked as an exhibit corresponded to the tires on the vehicle at the time of purchase. Moreover, a state police mechanic testified that the tread on the defective tire was "about 50 percent worn." He stated further that, because "the tire will go 20,000 miles under normal conditions[, y]ou've got 10,000 miles of wear on that tire." In fact, at the time it was seized on April 17, 1982, the defendant's pickup truck had been driven approximately 10,000 miles. In the light of such testimony, the trial court could reasonably have concluded that the defective tire offered in evidence had been on the defendant's truck when the Waterford assault occurred.

As part of his testimony, Paige stated at trial that the defect on the defendant's tire was "extremely unusual." His assessment as a tireprint expert was that the tire that had made the distinct print on February 4, 1982, was "in essentially the same condition" as the tire offered in evidence at trial. This testimony of Paige supports the conclusion that the defective tire offered in evidence by the state was in substantially the same condition as when the February 4, 1982 crimes were committed. We therefore conclude that the trial court did not abuse its discretion in admitting that tire into evidence.

## VII

In his appeal from his convictions arising from the assault in Old Lyme, the defendant claims that the court erred in permitting the state to offer opinion evidence of his bad character. The defendant asserts that Paul Cusson, a state trooper, "offered his opinion that [the

defendant] was a sexual assailant." The record, how-
ever, does not support the defendant's factual asser-
tion that Cusson so testified.

In support of the defendant's alibi defense, Bernard
Rosenblatt, a jeweler, testified that, on April 15, 1982,
the defendant, who was his friend, visited his home
"around ten minutes after 5 p.m." The state sought
to discredit Rosenblatt's account through the testimony
of Cusson and Chester Harris, a Clinton police officer.
Cusson testified that at the time of the sexual assault
in Old Lyme he "believed that [the defendant] had a
beard and mustache." The description given to the
police by the victim had referred to her assailant as
bearded. As a result of that belief, stated Cusson, he
"placed a phone call to the Clinton police department"
and asked Harris to "take a ride by [the defendant's]
house and see if there was a dark pickup truck in the
yard." Harris subsequently testified about the call from
Cusson, and stated that, in following through with Cus-
son's request, he saw "a blue Ford pickup truck, dark
blue," in the defendant's driveway at approximately
5:20 p.m.

The trial court denied the defendant's motion to
strike Cusson's testimony. The court explained that the
state had a right to "show some reason" for the 5:20
p.m. viewing of the defendant's residence by Harris.
Although the state was obligated to present such evi-
dence in "a manner as not to be unduly prejudicial,"
concluded the court, "the way that it's been done is
proper; and I think it's a fair way to get the picture
before the jury."

Evidence of a defendant's prior misconduct is not
ordinarily admissible to prove his bad character or
criminal tendencies. *State* v. *Ibraimov,* supra, 352.
Nowhere in Cusson's testimony, however, is there any
explicit reference to prior crimes of the defendant; cf.

*State* v. *Nardini,* 187 Conn. 513, 522, 447 A.2d 396 (1982); or any suggestion that the defendant had an evil disposition or a propensity to commit the crimes with which he was charged. Cf. *State* v. *Braman,* 191 Conn. 670, 675, 469 A.2d 760 (1983); see generally *State* v. *Williams,* 203 Conn. 159, 185–86, 523 A.2d 1284 (1987). While this testimony might have lent itself to an inference that Cusson regarded the defendant as a suspect, in context, the trial court could reasonably have concluded that its probative valule outweighed its prejudicial effect. We have stated that the trial court has broad discretion in determining the relevancy of proffered evidence, and its decision in this regard will be upheld on appeal unless it has abused its discretion. *State* v. *Bunkley,* 202 Conn. 629, 648–49, 572 A.2d 795 (1987); *State* v. *Braman,* supra, 676. We agree with the trial court that the state was entitled to "show some reason" for the observations of the defendant's residence to which Harris would testify. See *State* v. *Williams,* supra, 183–84; *State* v. *Smith,* 198 Conn. 147, 157–58, 502 A.2d 874 (1985). We conclude, therefore, that the court did not abuse its discretion in permitting the state to offer Cusson's testimony.

## VIII

The final claim of the defendant is that the trial court erred in admitting into evidence in the Old Lyme case the defendant's dark safety glasses. The defendant contends that, because the victim testified that she "really remember[ed] the glasses [worn by her assailant] being darker as they wrapped around" than the pair admitted into evidence, there was "no sufficient foundation for the admission of this evidence."

The victim testified that her assailant had worn "narrow, dark glasses which wrapped around." She stated that she had viewed a display of glasses in June, 1982, and had "selected a pair of glasses . . . as being simi-

lar to the ones that the man had worn on April 15th." That pair, she said, "could have been the same as the glasses that were worn by the assailant." Later in the trial, the prosecutor produced the pair of glasses selected from the display by the victim and asked her whether she could identify them. The victim responded that "[t]hey look like the glasses that were worn," that the color of the lenses and of the frames worn by her assailant "were dark like that." When Robert Neerman, a state trooper, subsequently testified that the glasses identified by the victim were similar to the pair he had "seized from the pickup truck belonging to the defendant," the glasses were marked as a full exhibit.

It was not until several days later, after the victim had been recalled as a witness, that she expressed reservations about the similarity between the glasses that had been marked as an exhibit and those that her assailant had worn. In this testimony, however, the victim maintained that the lenses and frames of the glasses in evidence "appear[ed] similar" to those she had observed during the assault. It was only "the shield on the side," or that part of the glasses that "wrapped around," that seemed differently shaded to her.

A court has a wide latitude in determining, in its discretion, whether to admit or exclude physical evidence. *State* v. *Piskorski,* supra, 699; *Katsetos* v. *Nolan,* 170 Conn. 637, 649, 650, 368 A.2d 172 (1976). Such evidence may be admitted if it is a fair and accurate representation of that which it attempts to portray. See *Tripp* v. *Anderson,* 1 Conn. App. 433, 435, 472 A.2d 804 (1984); C. Tait & J. LaPlante, Connecticut Evidence § 9.1 (c). In the present case, the victim's testimony, coupled with that of Neerman, reasonably established that the defendant's glasses were similar to those worn

by the assailant on April 15, 1982. See *State* v. *Paladine,* 2 Conn. Cir. Ct. 457, 458, 201 A.2d 667 (1964).

We conclude that, at the time the defendant's safety glasses were offered into evidence, a sufficient foundation had been laid for their admission. The minimal reservations subsequently expressed by the victim about the similarity between those glasses and the ones worn by her assailant did not retrospectively vitiate that foundation. Accordingly, we hold that the trial court did not abuse its discretion in admitting into evidence the defendant's safety glasses.

There is no error.

In this opinion the other justices concurred.