# STATE OF CONNECTICUT *v.* MICHAEL HILTON
## (AC 15845)

Dupont, C. J., and Foti and Freedman, Js.

Argued March 5—officially released May 20, 1997

*Robert P. Pickering*, with whom, on the brief, was *F. Mac Buckley*, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *John M. Massameno*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant appeals[1] from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a,[2] possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b),[3] and possession of narcotics in violation of

[1] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

[2] While the original information charged a violation of General Statutes § 53a-54a, the state's substitute information and bill of particulars charged a violation of General Statutes § 53a-54b, the statutory provision for capitol felony. The judgment file also shows a conviction under § 53a-54b. The state's brief cites § 53a-54b, but the defendant's brief cites § 53a-54a. The case, however, was tried pursuant to § 53a-54a and the trial court instructed pursuant to § 53a-54a. We conclude that this inconsistency is a result of a scrivener's error.

General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[3] General Statutes § 21a-278 (b) provides in relevant part: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a

General Statutes § 21a-279.[4] On appeal, the defendant asserts that the trial court improperly (1) refused to grant his motion to sever, (2) admitted an assault rifle into evidence, and (3) denied his motion to suppress a statement given during extradition. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On October 7, 1989, at approximately 4:20 a.m., Officer Christopher Hopkins of the Hartford police was dispatched to 241 Westland Street in Hartford, where he found the body of the victim, Thomas Byrd, near the curb. The cause of death was a .25 caliber bullet that had entered his chest, lungs and heart.

At the time of the shooting, the victim's girlfriend, Stephanie Jones, was living with her children and her mother in one of two apartments on the third floor of 241 Westland Street, a three story building with two apartments on each floor. The victim visited the apartment every evening after work. Jones' grandmother and her grandmother's husband lived in an apartment on the second floor. Yolanda Moody and Sonia Moody lived on the first floor. The defendant was Yolanda's boyfriend and was frequently present in the Moodys' apartment.

Drug trafficking occurred in the Moodys' apartment. People often knocked on Jones' grandmother's door at night looking for the Moody sisters and narcotics. Relations were tense between Jones and her relatives and the Moody sisters because Jones' grandmother had

---

drug-dependent person, for a first offense shall be imprisoned not less than five years . . . ."

[4] General Statutes § 21a-279 (a) provides in relevant part: "Any person who possesses or has under his control any quantity of any narcotic substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than seven years or be fined not more than fifty thousand dollars, or be both fined and imprisoned . . . ."

informed the landlord that the Moodys were selling drugs out of their apartment.

In the early morning of October 7, 1989, Jones was present in her apartment with the victim, her mother and her friend Stephanie White. Between 2:30 and 3 a.m., an argument broke out between Jones and Sonia Moody after a male and a female, who were looking for drugs, knocked first on Jones' door and then on her grandmother's door. Soon thereafter, Jones, her mother and White went downstairs, where they quarreled and fought with the Moody sisters in the inner hallway on the first floor. Three men emerged from the Moodys' apartment and watched the fight from the doorway. The defendant also observed the fight from the doorway of the Moodys' apartment. After approximately five minutes, the defendant ran into the Moodys' apartment and returned with a gun. He pointed the gun at the participants in the fight, waved it around, and then pointed it directly at the victim, who was holding Jones' grandmother on the staircase. The Moody sisters ran back into their apartment. White, the three men and the victim ran outside. The defendant followed directly behind the victim. When the victim was between the inner hallway and an outer hallway, the defendant shot and killed him.

The police investigation of the homicide and search of 241 Westland Street resulted in the discovery of evidence concerning not only the homicide, but also drug trafficking. In the inner hallway of that building, there was a pool of blood, blood drops, and a spent .25 caliber cartridge casing. In a hallway leading to the rear bedroom of the Moodys' apartment, the police found a blood stained lactose bottle discarded in a waste basket. In Yolanda's bedroom, the police discovered a set of car keys, a double beam scale, a roll of plastic sandwich bags, a note pad, a pager, a tote bag containing approximately one and one-half pounds of unpackaged raw

rice, a photograph in the frame of a dresser mirror of the defendant posing with a rifle, an album of photographs of the defendant and Yolanda Moody and their love letters. In the front bedroom of 241 Westland Street, the police found papers and an address book belonging to Sonia Moody.

The police also searched two cars near the scene of the shooting, a Toyota Corolla and a Plymouth Grand Fury. The Plymouth was owned by Sonia Moody, and its keys were found by the police in the rear bedroom of 241 Westland Street. In the Plymouth's trunk the police found a Heckler and Koch MP5 assault rifle and two loaded clips of ammunition. The Toyota was owned by Yolanda Moody, but was driven by the defendant more frequently than by Yolanda. Inside the Toyota's trunk, the police found a blue cosmetic bag holding $24,057 in thousand dollar bundles, a triple beam scale, and a box holding a spoon and a plastic bag that was embedded in rice and contained approximately 44 grams or 1.36 ounces of a white powder that was 84 percent cocaine in salt form.[5]

Following the homicide, the state attempted but failed to locate the defendant. An arrest warrant was

---

[5] Expert testimony established that many of the items found during the investigation are related to drug trafficking. Lactose is used to dilute the cocaine for purposes of sale. The plastic sandwich bags seized from the rear bedroom are typical packaging for the sale of cocaine. Beepers are commonly used in drug trafficking. The writing on the note pad seized from the rear bedroom constituted a record of narcotics sales to street level dealers. Double and triple beam scales are typically used by high level dealers handling larger amounts of narcotics. Raw rice is used to conceal and transport cocaine in order to keep it fresh. Guns are commonly used in the drug trade. Narcotics were found in the trunk of the Toyota. If narcotics sales are not underway, the practice of the dealer is to keep drugs in a safe but accessible location, such as a vehicle, basement, or an apartment not connected to the dealer. The money seized from the trunk would pay for a kilogram of cocaine. An assault rifle with considerable fire power, such as the Heckler and Koch MP5, is employed by high level dealers in the narcotics trade.

issued for him in February, 1990. The police learned in the summer of 1992 that he was incarcerated in a county correctional center in New Jersey. He was brought by automobile back to Connecticut, and, during this trip, he related to the police that he had waited at the scene of the shooting until the arrival of the police but then departed by bus for New York City because there was an outstanding warrant for his arrest in Washington, D.C. The defendant also said that neither the Toyota nor the Plymouth or their contents belonged to him and that the rifle in the Plymouth had been left there by someone he did not know. He commented that he had used the rifle in the Plymouth to pose for the picture that the police found in the rear bedroom of the Moodys' apartment. He also stated that he had been in the hallway of 241 Westland Street during a fight between the Moody sisters and other individuals and that he had heard a shot, but he did not know who had fired it. The defendant specifically claimed that he did not shoot the victim.

I

The defendant first asserts that the trial court improperly denied his motion to sever the murder and narcotics charges. He claims that he was substantially prejudiced and denied his constitutional right to a fair trial.

On December 31, 1992, the defendant filed a motion for severance of offenses, which the trial court, *Freed, J.*, denied on February 22, 1995, following the renewal of this motion.[6] The court allowed joinder of the murder and drug charges primarily because the state had proffered some evidence that the motive for the killing was connected with the defendant's drug sale.[7] The court

---

[6] It was agreed by the parties and ordered by the court that this motion, together with a motion to suppress also filed in December, 1992, would be heard at the time of trial or just prior to jury selection.

[7] The court conditioned its rulings on the state's ability, at trial, to support with admissible evidence its theory that the defendant's involvement in

also determined that the crimes were not particularly shocking or brutal, and that the trial was not expected to be lengthy or complex. The court concluded that the joinder of the drug charge to the murder charge would not substantially prejudice the defendant because the drug charge was a less severe offense and would not inflame the jury.

The defendant argues that the trial court abused its discretion in allowing the joinder because evidence of drug dealing adduced at trial is not relevant to the charge of murder. He claims that the state introduced the drug charges not to prove an element of the crime of murder, but rather, to bolster its murder case with collateral evidence.

"The test for whether cases should be consolidated for trial is multifaceted. The factors to be considered are (1) whether the charges involve discrete, easily distinguished factual scenarios, (2) how long and complex the trial was, and (3) whether one or more of the counts alleges brutal or shocking conduct by the accused. *State* v. *Chance*, 236 Conn. 31, 42, 671 A.2d 323 (1996) . . . ." (Citations omitted.) *State* v. *Stevenson*, 43 Conn. App. 680, 686, 686 A.2d 500 (1996). "[W]e . . . note that joinder of cases is favored . . . and that a trial court is authorized by statute and rule to order a defendant to be tried in one trial on charges arising from separate cases. General Statutes § 54-57;[8]

dealing drugs motivated the murder. The state proffered a witness, Michael Rondeau, who was incarcerated with the defendant at the community correctional center at Hartford, to testify that the defendant had killed the victim in a dispute arising out of a drug deal. The defendant did not object to Rondeau's testimony, germane to the defendant's motive for the killing. Because there was no objection to this evidence, we need not determine whether it was relevant and material as to the issue of motive.

[8] General Statutes § 54-57 provides: "Joinder of offenses of the same character. Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise."

Practice Book § 829."[9] (Citation omitted.) Id., 686–87. "The decision of whether to sever cases is within the discretion of the trial court . . . and will be overturned only if its discretion has been manifestly abused." (Citations omitted.) Id., 687. "The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice and that any resulting prejudice was beyond the curative power of the court's instructions." (Internal quotation marks omitted.) Id.

In disputing the first factor of the standard set out in *State* v. *Chance*, supra, 236 Conn. 31, the defendant concedes that the facts underlying the murder and the drug charges are distinguishable, but he claims that "this distinction has been blurred by the state because it consistently asserted that these offenses were inextricably webbed together." We conclude that the first *Chance* factor is met because the factual scenarios are clearly distinct, discrete and easily distinguishable. Our review of the record discloses that the evidence was presented in an orderly manner and was not confusing. The jury was capable of considering the evidence on the offense of murder separately and distinctly from the evidence concerning the drug charges. There was no danger that the jury used evidence of the one crime to convict the defendant of the other crime. See *State* v. *Crosby*, 36 Conn. App. 805, 809, 654 A.2d 371, cert. denied, 232 Conn. 921, 656 A.2d 669 (1995).

In considering the second factor, we must determine whether the duration of the trial and the complexity of the evidence was such as to make it likely that the jury weighed the evidence against the defendant cumulatively. The trial took sixteen days, with twenty-five witnesses presented and ninety-nine exhibits introduced.

---

[9] Practice Book § 829 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

The defendant argues "that a strong inference can be drawn that the jury was confused and that the trial was so long and complex that it enhanced the likelihood that the jury would weigh the evidence cumulatively." We do not agree.

There existed a clear line separating the narcotics cases from the case involving the allegation of murder in that witnesses and exhibits in each case fell into readily and easily distinguishable factual scenarios. The case against the defendant on the charge of murder was based substantially on the eyewitness testimony of the bystanders, whereas the two narcotics charges were presented by way of evidence from police officers' testimony concerning the seizures from the Moodys' apartment and the trunks of two automobiles. The bulk of the exhibits consisted of photographs of either the murder site, the hallways and sidewalk in front of 241 Westland Street, or the sites dealing with the drug charges, the garage with the two cars, the contents of the car trunks, Moody's apartment and its contents. We cannot conclude that the jury might easily have been confused by these photographs because the exhibits and evidence clearly fell into two easily identifiable and separate groups according to the charge and the distinctive factual scenario. We are also not persuaded that, under the circumstances of this case, a sixteen day trial was of such a duration as to itself enhance the likelihood of a cumulative weighing of the evidence.[10]

The last factor of *Chance* concerns the brutality or shocking nature of the crimes. As we have previously stated, "any murder involves violent and upsetting circumstances"; *State* v. *Stevenson*, supra, 43 Conn. App. 690; but a murder is not necessarily so brutal and shock-

---

[10] Compare *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987) (concluding that joinder of charges relating to four factually similar incidents improper because trial lasted ten weeks and fifty-five witnesses testified).

ing that a jury could not treat, with proper instruction, that crime and any other crime separately. See *State* v. *Herring*, 210 Conn. 78, 97, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d. 579 (1989). The test is whether the facts of one crime are so brutal or shocking as to amount to prejudice if tried together with another crime. *State* v. *Jennings*, 216 Conn. 647, 659, 583 A.2d 915 (1990). Our review of the record discloses that the charges are not so brutal or shocking as to preclude joinder. We do not discern a high risk of one offense being tainted by anything unusually shocking or brutal in the nature of the other, "especially if the evidence as to each would have been cross admissible had the cases been tried separately." *State* v. *Stevenson*, supra, 43 Conn. App. 691. There was some evidence presented as to the motive for the murder,[11] which the jury was free to accept in part, in total, or not at all. "Where evidence of one incident can be admitted at the trial of [another incident], separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." *State* v. *Pollitt*, 205 Conn. 61, 68, 530 A.2d 155 (1987).

The trial court amply and properly instructed the jury, both at the beginning of trial and during final instructions, that each count alleged a separate crime and that the jury was required to consider each charge separately. The jury, therefore, had specific direction to keep the charges separate. We conclude that the trial court did not abuse its discretion in denying the defendant's motion for severance.

## II

The defendant next contends that the trial court improperly admitted as evidence the assault rifle seized

---

[11] See footnote 7.

from the trunk of the Plymouth owned by Sonia Moody. He asserts that the introduction of that evidence was improper because it had no relevance whatsoever to the specific elements of the crimes charged. The defendant also argues that its prejudicial impact far outweighed its probative value in that its purpose was to influence the jurors and convince them that the defendant was a bad person.

The trial court, in admitting the evidence, concluded that the weapon was sufficiently linked to the defendant by the photograph in Yolanda Moody's bedroom of him posing with a weapon similar in appearance, and by the defendant's statement to Detective Stephen Kumnick that he had posed for that picture with the rifle that the police found in the Plymouth.[12] In support of his objection, the defendant specifically stated at trial that the weapon was not sufficiently connected to him in that the Plymouth was never linked to him, and that the assault rifle was not probative of the state's theory of motive, i.e., the shooting was a result of a drug operation conducted by the defendant. Following the overruling of his objection to the admission of the weapon into evidence, the defendant, without waiving his claim of prejudice, objected to the use of the photograph of the weapon after an initial display to the jury, and prevailed. The weapon itself, however, was used throughout the trial instead of the photograph.

The determination of relevance is left to the broad discretion of the trial court. *State* v. *Sauris*, 227 Conn. 389, 407, 631 A.2d 238 (1993). Evidence is relevant if it may reasonably be construed to establish a fact at issue or to corroborate other direct evidence in the case. *State* v. *Greene*, 209 Conn. 458, 477, 551 A.2d 1231 (1988). We

---

[12] The defendant's motion to suppress these statements was denied except as to his silence in response to questions related to self-defense. The trial court did not issue a written decision as to its ruling. The defendant did not file a notice with this court pursuant to Practice Book § 4059 (b).

defer to a trial court's finding unless there has been a clear abuse of discretion. *State* v. *Sauris*, supra, 407. We give every reasonable presumption in favor of the court's ruling; reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. *State* v. *Coleman*, 35 Conn. App. 279, 285, 646 A.2d 213, cert. denied, 231 Conn. 928, 648 A.2d 879 (1994). Our Supreme Court has held that a gun may be relevant to the issue of intent to sell narcotics. *State* v. *Delossantos*, 211 Conn. 258, 280–81, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989); *State* v. *Avila*, 166 Conn. 569, 580, 353 A.2d 776 (1974).

Normally, evidence of other crimes or bad acts is treated as inadmissable character evidence, unless such evidence is offered to prove the existence of a larger plan, scheme or conspiracy of which the crime charged is a part, or such evidence tends to establish a fact in issue or to corroborate other evidence in the case. *State* v. *Mozell*, 36 Conn. App. 672, 675, 652 A.2d 1060 (1995).

Our Supreme Court has repeatedly noted that there is a well established correlation between drug dealing and firearms. *State* v. *Cooper*, 227 Conn. 417, 426 n.5, 630 A.2d 1043 (1993). Weapons are tools of the narcotics trade, used to protect the dealer's goods. See *State* v. *Delossantos*, supra, 211 Conn. 281. We have indicated that evidence of firearms at a defendant's residence is relevant to the issue of drug distribution. *State* v. *Lee*, 30 Conn. App. 470, 489, 620 A.2d 1303 (1993), aff'd, 229 Conn. 60, 640 A.2d 553 (1994).

It was the state's theory that the defendant was a drug dealer, that drug dealers often employ assault rifles to secure their operations through intimidation and fear, that the defendant possessed this weapon, or had ready access to it, and that drugs supplied the motive for the killing. The defendant's link to the assault rifle

was established through the photograph, the defendant's own statements, his close relationship with Yolanda Moody, his frequent presence in her apartment and the presence in her bedroom of the keys to the trunk of the Plymouth where the rifle was stored. We distinguish the present matter from our decision in *State v. Mozell,* supra, 36 Conn. App. 672, where we concluded that no evidence was presented to show the defendant to be in possession of the gun. Here, the state presented evidence tending to show each step of its theory. Whether that evidence was credible and what weight it should be given, if accepted, is a function of the jury. "The jury's sole province as the trier of fact is to draw all reasonable and logical inferences from the facts as it finds them to exist. . . . The jury also has the sole and absolute responsibility to weigh conflicting evidence and to determine the credibility of witnesses." (Citations omitted.) *State v. Rivera,* 32 Conn. App. 193, 201, 628 A.2d 996, cert. denied, 227 Conn. 920, 632 A.2d 698 (1993).

The defendant argues that even if the weapon is relevant, the introduction of that type of weapon in itself caused prejudice that outweighed its probative value. "Resolution of these determinations is left to the sound discretion of the trial court judge." *State v. Pickering,* 38 Conn. App. 536, 545–46, 662 A.2d 804, cert. denied, 235 Conn. 907, 665 A.2d 905 (1995). The trial court, in balancing the prejudicial effect of this evidence, concluded that it would be very unlikely for the jury to infer, in any manner, that because the defendant had ready access to this assault rifle, that he was likely to have fired a .25 calibre handgun, the gun involved in the murder. The trial court did not view this evidence as being so inflammatory as to arouse unduly the jurors' hostility or enmity towards the defendant. The trial court cautioned the jurors, during final instructions,

that they could not use evidence as presented to infer that the defendant was a bad person.[13]

We conclude, under the facts and circumstances of this case, that the trial court did not abuse its discretion in admitting the assault rifle into evidence.

## III

The defendant also claims that the trial court improperly denied his motion to suppress as evidence the statement he made to Kumnick while being extradited from New Jersey. He alleges that he was denied his right to counsel pursuant to the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.[14]

The facts relevant to this claim are as follows. At the hearing on the motion, Kumnick testified that he had been contacted by Attorney Steven Meo on September 22, 1992, and that Meo had asked him not to question the defendant during the car trip to Connecticut. He had asked Meo if he was representing the defendant, and Meo had replied that he was not, but that he might file an appearance if the defendant was arrested. Kumnick responded that he would advise the defendant of his rights, and it would be the defendant's decision whether to be questioned. Kumnick had no further contact with Meo before traveling to New Jersey on September 26, 1992.

---

[13] The court charged: "You may not consider evidence of misconduct by the defendant other than that charged to conclude that the defendant is a bad person and, therefore, more likely to commit the crimes charged. This is not permissible and you may not do that."

[14] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to . . . have the assistance of counsel for his defense."

Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have the right to be heard by himself and by counsel . . . ."

At the New Jersey prison, the defendant was presented with a warrant for his arrest, told he was going back to Connecticut, shackled and belly chained, and placed in the back of a police automobile. He was read his rights from a standard police card, including his right to remain silent and his right to an attorney. During the three and one-half hour trip, Kumnick asked the defendant his name, when he first entered the United States and his birth date. The defendant responded that the name he used was Jerome Thorpe and his birth date was August 11, 1964. The defendant asked why he was charged with murder, given that he was being attacked in a hallway by three other men. Kumnick responded by asking whether he was going to claim self-defense. The defendant did not respond. The defendant went on to inform Kumnick that he had remained at the scene of the shooting until the arrival of the police and had left due to an outstanding warrant for his arrest in the District of Columbia. When the defendant asked about the narcotics charges, Kumnick informed him that cocaine had been found in the Toyota and an assault rifle in another car. The defendant replied that the Toyota did not belong to him and that the rifle had been left by an unknown person. Kumnick informed the defendant that the police had found, in Yolanda Moody's bedroom, a photograph of him posing with a rifle. The defendant admitted to posing with the rifle that had been found in a car trunk. Upon reaching the Hartford police station, Kumnick asked the defendant if he had an attorney and if he wanted to be interviewed, and the defendant replied that he did not know. The defendant told Kumnick that there was a fight involving a dozen people, that an individual whom he declined to name pulled Yolanda Moody from the crowd, and that he heard a shot, but did not know who did the shooting. When asked by Kumnick whether he wanted to reduce his statement to writing, whether he had an

attorney and whether he wanted Meo to represent him, the defendant repeated that he did not know. When asked again if he wanted to speak with Meo, the defendant said, "Yes."

The trial court found that the defendant was interrogated during the trip to Connecticut, but that the defendant had been advised of his rights and he had knowingly and intelligently waived his rights. The court also concluded that Meo was not empowered to invoke the bar against self-incrimination on behalf of the defendant.

The state argues that the defendant failed distinctly to raise in the trial court the constitutional basis that he raises on appeal. The state claims that because he did not properly preserve his claim at trial, he can prevail on appeal only if he can satisfy the guidelines as set forth in *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). We do not agree that the claim is not properly preserved.

We are not bound to consider claims of law not properly raised at trial. *State* v. *Carter*, 34 Conn. App. 58, 73, 640 A.2d 610, (1994), rev'd on other grounds, 232 Conn. 537, 656 A.2d 657 (1995). The defendant's motion to suppress[15] presented the trial court with only his waiver of fifth amendment rights under *Miranda* v.

---

[15] The defendant's motion to suppress set forth the following allegations:

"(1) The defendant, Michael Hilton, was taken into custody by Detectives Kumnick and [Greg] Merrick on [Sept. 26, 1992], for the purpose of transporting the defendant from the Monmouth County Correctional Institution in Freehold, New Jersey to the Hartford Police Department.

"(2) While transporting the defendant to Hartford, Detectives Kumnick and Merrick advised defendant of his constitutional rights and then began to make statements to defendant which were reasonably likely to elicit an incriminating response.

"(3) The defendant did not waive his *Miranda* rights at any time during the interrogation by the detectives, yet the interrogation continued throughout the ride to Hartford.

"(4) Any statements made by the defendant to Detectives Kumnick and Merrick during the trip to the Hartford Police Department were the result of an illegal custodial interrogation, and should be suppressed."

*Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). It is apparent from the record, however, that the defendant orally incorporated a "right to counsel" claim as part of his claim and that the trial court ruled on this additional claim without any apparent objection by the state.

We note initially that the defendant challenges the trial court's finding that he validly waived his *Miranda* rights. He does not claim that he was denied reasonable access to an attorney; *State* v. *Stoddard*, 206 Conn. 157, 167, 537 A.2d 446 (1988); or denied such access at "a meaningful time and in a meaningful manner." *Washington* v. *Meachum*, 238 Conn. 692, 740, 680 A.2d 262 (1996) (*Berdon, J.*, dissenting). The defendant claims that he was deprived of "knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning those rights," specifically because he had not been apprised of Meo's admonitions to the police. He claims that the police used an "egregious psychological coercion" to obtain an ineffective waiver of his sixth amendment right to counsel.

The defendant alone may invoke his right to counsel. *State* v. *Stoddard*, supra, 206 Conn. 167. Our Supreme Court, however, has stated that "a suspect must be informed promptly of timely efforts by counsel to render pertinent legal assistance. Armed with that information, the suspect must be permitted to choose whether he wishes to speak with counsel . . . or whether he will [forgo] assistance of counsel . . . . The police, because they are responsible for the suspect's isolation, have a duty to act reasonably, diligently and promptly to provide counsel with accurate information and to apprise the suspect of the efforts by counsel." Id., 166–67.

The defendant was incarcerated in New Jersey prior to his return to Connecticut. Four days prior to that

return, Meo requested of the police that they not question the defendant. Meo's request was, in effect, refused. Meo was told that the defendant would be advised of his rights, and it would be the defendant's decision whether to be questioned. Meo did not contact the defendant in New Jersey, nor did he attempt to contact the defendant's attorney in New Jersey. Meo was on notice that it was necessary for him to contact the defendant himself if he wanted to advise him, and he had four days to do so. He was not effectively prevented from contacting the defendant on his own and could not expect that the police would be obliged to act on his behalf. They had no constitutional obligation, under these circumstances, to advise the defendant further than those warnings required under *Miranda*, nor were they required not to interrogate him following that advisement. While police may have a duty to apprise a suspect of the efforts by counsel, even absent the attorney-client relationship,[16] to render pertinent legal assistance; *State* v. *Stoddard*, 206 Conn. 167–72; the circumstances present here do not create the same duty required in *Stoddard*.

We conclude that the defendant's federal and state constitutional rights to counsel, essential to his ability to understand the nature of his rights and the consequences of abandoning those rights, were not violated and that under the totality of the circumstances, as the trial court found, he knowingly and intelligently waived his *Miranda* rights.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[16] The trial court found that the defendant was unaware of any role on his behalf by Meo. Meo acknowledged that no attorney-client relationship existed between him and the defendant during the transfer from New Jersey.