## STATE OF CONNECTICUT *v.* MARK BANKS
## (AC 19505)

Hennessy, Mihalakos and Zarella, Js.

Argued April 5—officially released August 1, 2000

*Susan M. Hankins*, assistant public defender, with whom, on the brief, was *Steven Yudkin*, certified legal intern, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Kevin J. Murphy*, assistant state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, Mark Banks, appeals from the judgments of the trial court, rendered after a jury trial, of four counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), four counts of kidnapping in the first degree in violation of General Statutes § 53a-92 and two counts of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c. The defendant claims that the court improperly (1) failed to suppress in-court and out-of-court identifications of him that were obtained as the result of impermissibly suggestive procedures and were not reliable under the totality of the circumstances, (2) consolidated for trial three factually similar but legally unconnected informations, refused to instruct the jury that the state was not prosecuting one of the three

cases against him that the jury had been told it would hear and refused to allow defense counsel to "make any reference to the fact that prior to the voir dire there was a third case," (3) determined that there was sufficient evidence to sustain his conviction for criminal possession of a pistol or revolver when the state had failed to prove the allegedly essential element of operability and failed to instruct the jury that operability was an essential element that the state was required to prove and (4) failed to instruct the jury that it should give no greater or lesser weight to the testimony of police officers on account of their occupational status and charged the jury regarding expert testimony when police officers were the only witnesses to whom the instruction could apply. We affirm the judgments of the trial court.

The following procedural facts are necessary for a resolution of this appeal. The defendant was charged in connection with three robberies in three separate informations, which the court, on the state's motion, joined for trial. Following a pretrial hearing, the state nolled and the court dismissed one information because the victim had told the prosecutor that the defendant was not the perpetrator.[1] Prior to trial, the defendant objected to the consolidation and, on the day evidence began, orally renewed his motion to sever the two remaining cases on the ground that although they were factually similar, they were legally unconnected. The court denied the motion and adopted its prior conclusion[2] that the cases properly

[1] The information resulted from a robbery that occurred on September 11, 1995, at the Dress Barn store in Rocky Hill. After testifying in a hearing on the defendant's motions to suppress certain identifications of him, Marianne Jean, a witness for the state, told the prosecutor that she was 100 percent sure that the defendant was not the person who robbed her. Upon learning this, the state nolled the case.

[2] The court ruled on the defendant's motion to sever as follows: "The court concludes that this defendant is not substantially prejudiced, that the three incidences are factually similar and that they are legally connected. That is, the evidence of one would be admissible under our evidentiary rule

were joined.[3] Thus, the remaining two cases remained joined for trial.

that permits evidence of similar misconduct, evidence to be admitted to prove a separate case.

"Just the highlights that the court would like to point out for the record are that the three incidences occurred during a two week period at similar, not the same, but somewhat similar retail businesses within approximately thirty minutes of closing time. That in all three robberies there were no customers present. That the defendant appeared to adopt a similar modus operandi, approached the cash register with some type of a bag and removed a gun from that bag.

"All the victims described the gun as a silver revolver with brown-colored grips. Method of robbery appeared to be consistent in that a demand was made, that the cashier removed the money from the cash register [and] when receiving the money [the defendant] demanded the bank deposit bags.

"In the three robberies before us, the defendant ordered that the victims enter a bathroom or back room while the defendant made his escape. He also threatened them [telling them] not to call the police. He said the police will do their job. The robber in all three incidences was a black male, described as between six feet and six feet, two [inches tall], early thirties, between 200 and 220 pounds. In two of the robberies, he was accompanied by a black female, five [feet] four to five [feet] six [inches tall], middle to late twenties, medium build, medium length black, straight hair.

"Of the six witnesses who viewed the [photographic] array, five positively identified the defendant as the male perpetrator, according to the affidavits. One indicated that the defendant's photograph looked like the robber.

"The court concludes that under these circumstances, the defense cannot establish [that] joinder would result in substantial injustice. The court will caution the jury on several occasions whenever it is relevant and significant that [it] must find this defendant guilty or acquit based solely on the evidence presented by the state.

"Having said so, the motion for joinder is hereby granted. An exception is noted for the record."

[3] The court ruled on the motion, stating: "The court finds that the two cases are factually similar and legally connected, and that if charges did not exist on either one or the other case, the state has a sufficiently strong enough case to establish prior acts of misconduct [thereby] establishing intent, identification and motive, mode of operation.

"African-American, closing time, motive robbery, silver handgun, the kidnapping, going to the cash register, coming in with the brown bag, ordering people into a separate room clearly establishes—same type of store, same victims, if not identical but same business operation, clearly is—clearly leads the court to the conclusion that they are legally connected and that one of these cases could have been introduced in the trial itself. Therefore, [the] court finds no prejudice whatsoever. The motion to sever is denied. Exception noted."

The jury reasonably could have found the following facts with respect to an August 30, 1995 robbery alleged in one of the two informations on which the state proceeded at trial. Michael Kozlowski and Howard Silk were working that evening at the Bedding Barn store in Newington. The defendant, posing as a customer, entered the store shortly before closing at 9 p.m.; there were no other customers in the store. Kozlowski approached the defendant and began to show him some king-size beds. The defendant pulled a large silver gun from a bag he was holding. The gun had a round cylinder. The defendant, while pointing the gun at Silk, ordered Kozlowski to open the cash register. After taking money from the register, the defendant requested the store's bank bag or safe. The defendant then asked Silk and Kozlowski for the money from their wallets. He then took money from Silk, but not from Kozlowski. Silk and Kozlowski were then locked in the bathroom with something propped against the door and told not to leave or they would be shot. A short time later, when Silk and Kozlowski heard the doorbell in the store ring, they assumed the robber had left, pushed open the bathroom door and called the police.

The jury reasonably could have found the following facts with respect to a September 13, 1995 robbery alleged in the second of the two informations on which the state proceeded at trial. Kelly Wright was working that evening at the Bedding Barn store in Southington. Shortly before 9 p.m., while Wright's roommate, Idelle Feltman, was waiting to take her home, the defendant and an unknown woman, posing as customers, entered the store. The defendant pulled a gun from a bag he was carrying, held it to Feltman's temple, and asked her to open the cash register and to give him money. The defendant then requested the bank bag, which Feltman gave him. The defendant then told Wright and Feltman to get into the bathroom and lock themselves in. Shortly

thereafter, Feltman and Wright heard the door buzzer and surmised that the defendant had left the store. They exited the bathroom and called the police. Other facts will be discussed where they are relevant to the issues in this appeal.

I

The defendant claims first that the court improperly failed to suppress in-court and out-of-court identifications of him that were obtained as the result of impermissibly suggestive procedures and were not reliable under the totality of the circumstances. The defendant claims that the denial of his motions to suppress the identifications resulted in the denial of his constitutional rights to due process and a fair trial in violation of the fifth, sixth and fourteenth amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut. We disagree.

The following additional facts are necessary for our resolution of this claim. During the hearing on the defendant's motions to suppress, Feltman, Wright and Detective Craig Fournier of the Southington police department testified as to the September 13, 1995 robbery. Feltman testified that she was able to observe the defendant for about five or six minutes during the robbery and that the robber held the gun to her temple. Feltman testified that she described the robber to the police as wearing a red shirt, thinly built, about six feet tall and weighing about 200 pounds, and without facial hair. Feltman testified that approximately four months later, when she picked the defendant's photograph out of a police photographic array, she noted to Fournier that unlike in the photograph, the robber's hair was shorter and he did not have facial hair. Feltman also testified that the eyes and ears of the defendant were very vivid, and that when she observed the defendant's photograph she "turned very sweaty." She further testi-

fied that when she saw the defendant's photograph, "My stomach started bothering me, and I looked closer into the eyes, and that's what I saw that night."

Wright testified that she observed the robber for approximately five or six minutes during the robbery. She testified that she described the robber to the police as a black male, tall, approximately 200 pounds, in his late twenties or early thirties. She also had looked at a police photographic array and testified that "when [she] saw the eyes in that photograph, it brought flashbacks back." She testified that she told Fournier that "[t]his looks like the gentleman that robbed me." She further testified that the robber did not have any facial hair and that the hair in the police photograph she had looked at was different.

Fournier testified as follows regarding the procedure for showing Feltman and Wright the photographic lineup: "I advised them that they would have to view the lineup separately. I couldn't show it to them at the same time. I had one of them step around the corner. I don't recall who I showed it to first, but the other one stepped around the corner out of view. I explained to both women that the suspect who had done the robbery may or may not be in this photographic lineup and to view the photos carefully, and if they see the person who did the robbery to indicate which one he is."

"To determine whether a pretrial identification procedure, such as the photographic array in this case, violated a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unneces-

sarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable." (Citations omitted; internal quotation marks omitted.) *State* v. *Collins*, 38 Conn. App. 247, 261–62, 661 A.2d 612 (1995).

In this case, the defendant claims that the photographic array was unnecessarily suggestive because it was not based on the various descriptions that the witnesses to each of the three robberies gave to the police on the nights of those robberies, i.e., that the robber was clean-shaven with no facial hair. The defendant further claims that the array was unnecessarily suggestive because it was not based on two composites prepared by the police, but instead was based on the physical description of the defendant.

The defendant makes much of the fact that the array contained only photographs of men with facial hair, a physical characteristic that does not conform to the description of a clean-shaven robber that was given by the witnesses. We fail to see how this could be unnecessarily suggestive. First, the witnesses all were able to pick the defendant from the array notwithstanding that his photograph and many of the others in the array showed facial hair. Second, had the array contained the defendant's photograph with facial hair while the other photographs contained none, there might be an argument that the defendant would stand out from the others. That, however, is not the case here. Third, the defendant points to no case law to support his argument that his photograph and the others in the array must exactly meet the physical description of the suspect. We see no reason why a suspect cannot be included in a photographic array with photographs of other individuals bearing a description similar to but

not exactly the same as descriptions given by witnesses to the crimes. This is especially true where, as here, the most prevalent physical difference between the individuals in the photographs and the witnesses' descriptions was the presence of facial hair, which can change rapidly. "We conclude, therefore, that the defendant failed to carry his burden of proving that the identification procedure gave rise to a very substantial likelihood of irreparable misidentification. Because we conclude that the arrays used to identify the defendant were not unnecessarily suggestive, we need not consider whether the identifications were nevertheless reliable." Id., 262–63.

II

The defendant next claims that the court improperly consolidated for trial two factually similar but legally unconnected informations. In connection with this claim, the defendant asserts that the court improperly refused to instruct the jury that the state was not prosecuting one of the three cases that the jury had been told it would hear and refused to allow defense counsel to make any reference in final argument to the jury about the fact that prior to voir dire there was a third case. The defendant claims that he was deprived of his constitutional rights to due process, a fair trial and the assistance of counsel in violation of the fifth, sixth and fourteenth amendments to the United States constitution, and article first, §§ 8 and 9, of the constitution of Connecticut. We disagree.

The following additional facts are necessary for our resolution of this claim. The defendant was originally charged in three separate informations with robberies and kidnappings on three separate dates at three separate locations, for which the state had three separate sets of witnesses. The state moved to join the three cases, claiming that each of the offenses would be

admissible at trial on the issue of identity. The court joined the cases, finding "that this defendant is not substantially prejudiced, that the three incidences are factually similar and that they are legally connected. That is, the evidence of one would be admissible under our evidentiary rule that permits evidence of similar misconduct, evidence to be admitted to prove a separate case."

In addition to the August 30, 1995 and September 13, 1995 robberies previously discussed, the defendant also was charged in a separate information with a September 11, 1995 robbery at the Dress Barn store in Rocky Hill. At the hearing on the defendant's motions to suppress certain identifications of him, Marianne Jean, a witness for the state, testified that between 8:30 p.m. and 9 p.m. on September 11, 1995, she was ringing up a sale when the robber, who she thought was a customer, brandished a gun, said that it was not a toy and that he wanted money. She testified that she was able to observe the defendant for a couple of minutes under good lighting conditions. She testified that the robber was accompanied by a woman. After the robbery, she described the robber as six feet, two inches tall, with a medium frame and clean-shaven. She further testified that when she was shown a police photographic array, she picked the defendant's photograph but was not 100 percent sure of the identification, stating, "[T]hat picture looked like the person except for the facial hairs." After her testimony, she told the prosecutor that she was sure that the defendant was not the person who robbed the store.

On the basis of a lack of positive identification, the prosecutor nolled the charges as to the September 11, 1995, incident. The defendant then moved to sever the remaining two cases.[4] The court denied

---

[4] The defendant argued: "We have here what appears to be a classic case of a situation where the two cases that are now being prosecuted are factually similar but legally unconnected, and cases that I cite, which indicate

the motion.[5]

"The trial court has discretion to determine whether separate cases involving the same defendant should be consolidated; *State* v. *Pollitt*, 205 Conn. 61, 67–68, 530 A.2d 155 (1987); and the exercise of that discretion may not be disturbed on appeal unless it has been manifestly

when they're factually similar but legally unconnected—the cases that I cite are [*State* v. *Schroff*, 198 Conn. 405, 503 A.2d 167 (1986)] at page 409, and [*State* v. *Smith*, 10 Conn. App. 624, 525 A.2d 116, cert. denied, 204 Conn. 809, 528 A.2d 1156 (1987)], and just briefly by way of argument, the case that is not being prosecuted was essentially [the] linchpin, that connector between the other two Bedding Barn cases.

"I would note that . . . we now have a situation where one Bedding Barn case had the use of an accomplice. I believe that was the [September 13, 1995 Dress Barn] robbery. Whereas, the [August 30, 1995] Bedding Barn [robbery] had no accomplice. The [September 11, 1995] Bedding Barn robbery had the use of an accomplice. So, now there is, except for the similarity of the fact that we have two Bedding Barns being robbed and by a black male, even the descriptions are different.

"In the . . . August 30 Bedding Barn robbery, the person is described as husky, big build. In the . . . September 13 Bedding Barn robbery, the person is described as thin or thin build. So, basically all we have here is two Bedding Barns being robbed by a person who's a black male. Those are the only similarities we have. We feel that that would be prejudicial.

"And, finally, now we have more crystallized the problem with whether or not [the defendant] should testify because now, on the one hand, the August 30 Bedding Barn robbery, his alibi is not nearly as strong [and] the need to possibly testify much greater, and [for] the September 13 Bedding Barn robbery, he has alibi witnesses from his workplace, and his need to testify would be much less, and he's going to be put to a choice based on both the weak alibi and the much stronger alibi, and it prejudicially affects his decision of whether or not to exercise his constitutional right not to testify.

"So, for those reasons, we claim now, we maintain now that the cases should be severed, and we should try with this jury the first case that the prosecutor chooses to prosecute and then after that if the prosecutor chooses to go forward with the second case. . . .

"[Assistant State's Attorney]: Briefly, Your Honor, I think the court's previous decision to join these cases for trial is even more compelling now, frankly, with the . . . removal of the Rocky Hill, the September 11 incident. Now we are only dealing with two separate incidents. . . . I still believe that the incidents may be admissible to show identity, and I will show the similarities.

"They really haven't changed. It's within the same two week period."

[5] See footnote 3.

abused. Id. To demonstrate that the trial court abused its discretion, the defendant bears the heavy burden of convincing this court that the joinder resulted in substantial injustice. Id., 68.

"In Connecticut, joinder of cases is favored. . . . Joinder expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once. . . . In determining whether joinder is appropriate, the court must consider several factors. The factors to be considered are (1) whether the charges involve discrete, easily distinguished factual scenarios, (2) how long and complex the trial was, and (3) whether one or more of the counts alleges brutal or shocking conduct by the accused. *State* v. *Stevenson*, 43 Conn. App. 680, 686, 686 A.2d 500 (1996), cert. denied, 240 Conn. 920, 692 A.2d 817 (1997). If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred from improper joinder. *State* v. *Lee*, [32 Conn. App. 84, 106–107, 628 A.2d 1318, cert. denied, 227 Conn. 924, 632 A.2d 702 (1993), cert. denied, 510 U.S. 1202, 114 S. Ct. 1319, 127 L. Ed. 2d 668 (1994).]" (Citations omitted; internal quotation marks omitted.) *State* v. *Walsh*, 52 Conn. App. 708, 711–12, 728 A.2d 15, cert. denied, 249 Conn. 911, 733 A.2d 233 (1999).

A

The defendant first claims that he was substantially prejudiced when the court consolidated for trial and refused to sever two factually similar but legally unconnected informations. We disagree.

At the outset, we set forth our standard of review. "A trial court will not have manifestly abused its discre-

tion in denying severance if the state's orderly presentation of evidence has prevented confusion of the jury and has enabled the jury to consider the evidence relevant to each charge separately and distinctly. See *Drew* v. *United States*, 331 F.2d 85, 89 (D.C. Cir. 1964); *State* v. *Bell*, 188 Conn. 406, 411, 450 A.2d 356 (1982); *State* v. *King*, [187 Conn. 292, 301, 445 A.2d 901 (1982)]." *State* v. *Pollitt*, supra, 205 Conn. 68.

Applying those factors to this case, we note first that the factual scenarios for each robbery were simple and distinct. Our review of the record reveals that the evidence for each robbery was presented in an orderly manner and in a way that the jury could consider it separately and distinctly. The court repeatedly reminded the jury that it was not to aggregate the evidence, but that it was to consider each robbery and the evidence presented separately.

Second, the trial was not long or complex. It lasted only six days and involved only two incidents. See *State* v. *Walsh*, supra, 52 Conn. App. 713 (trial not unduly long or complex when it lasted six days and involved only two victims); *State* v. *Hilton*, 45 Conn. App. 207, 214–15, 694 A.2d 830, cert. denied, 243 Conn. 925, 701 A.2d 659 (1997) (trial involving two separate charges not unduly long or complex when it lasted sixteen days with twenty-five witnesses presented and ninety-nine exhibits introduced), cert. denied, 522 U.S. 1134, 118 S. Ct. 1091, 140 L. Ed. 2d 147 (1998); *State* v. *Stevenson*, supra, 43 Conn. App. 689 (trial not unduly long or complex when it lasted six days and involved two incidents).

Third, the crimes alleged were not particularly brutal or shocking. "The test is whether the facts of one crime are so brutal or shocking as to amount to prejudice if tried together with another crime. *State* v. *Jennings*, 216 Conn. 647, 659, 583 A.2d 915 (1990)." *State* v. *Hilton*,

supra, 45 Conn. App. 216. The charges here are not so brutal or shocking that joinder is precluded. In fact, our Supreme Court has held that even murder is not necessarily so brutal and shocking that with proper instruction it could not be considered by a jury along with another crime. See *State* v. *Herring*, 210 Conn. 78, 97, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989). Furthermore, "[w]e do not discern a high risk of one offense being tainted by anything unusually shocking or brutal in the nature of the other, 'especially if the evidence as to each would have been cross admissible had the cases been tried separately.' *State* v. *Stevenson*, supra, 43 Conn. App. 691." *State* v. *Hilton*, supra, 216. While it is true that evidence of other crimes may not be used to show bad character, it may be used to show intent, malice or common scheme if its probative value exceeds its prejudicial effect. *State* v. *Greene*, 209 Conn. 458, 464–65, 551 A.2d 1231 (1988); *State* v. *Pollitt*, supra, 205 Conn. 69.

In this case, the factual similarities of each robbery weigh in favor of admissibility to show a common scheme. Both were committed within two weeks of one another and in close physical proximity; both stores were Bedding Barns; both were robbed by a black male near closing time; the suspect described by the witnesses from each store was carrying a bag from which he pulled a silver handgun; the suspect in each case asked for the bank bag after asking for money from the cash register; the suspect in each case locked the victims in a room and fled. These facts compare favorably with cases upholding common scheme evidence. See, e.g., *State* v. *Greene*, supra, 209 Conn. 465–66.

We conclude, therefore, that the court did not abuse its discretion in consolidating the two informations for trial and that its ruling did not cause the defendant

substantial prejudice. See *State* v. *Pollitt*, supra, 205 Conn. 67–68.

B

The defendant next claims that the court improperly refused to instruct the jury that the state had decided not to prosecute the September 11, 1995 robbery at the Dress Barn in Rocky Hill. The following additional facts are necessary for the resolution of this claim.

During jury selection, the court in its preliminary instructions told the jury that the defendant was charged with crimes stemming from three separate incidents at three separate locations. After the jury was selected but before trial began, the state entered a nolle on the September 11, 1995 robbery after a hearing on the defendant's motions to suppress certain identifications of him. Before the jury was sworn, the defendant made an oral motion requesting that the jury be advised that the state had elected not to proceed on the September 11, 1995 robbery.[6] The court denied the motion and ruled that it was "simply going to tell [the jurors] that they have two cases before them today."

The claim here is similar to one made in *State* v. *Safford*, 21 Conn. App. 467, 470, 574 A.2d 1305, cert. denied, 216 Conn. 803, 577 A.2d 717 (1990), in which two separate incidents of sexual assault were alleged. "Because the two assaults were to be consolidated for trial, the court made brief references to the fact that the defendant was being charged with two separate incidents during its preliminary instructions to the

---

[6] Defense counsel in his oral motion stated: "I also wanted to address [the fact that] this jury was picked and was [given a preliminary instruction] on the basis of three separate files. There are now only two being prosecuted, and I think that the jury ought to be advised regarding the fact that what was once three files is now only two files, and I suggest that the jury be told that as to the third file that the state has elected not to prosecute that particular file, and I would ask that that be indicated to the jury. I also was—well, I would like the court to make some sort of decision on that."

venire from which the jury was selected. Defense coun-
sel also referred to the two incidents during his voir
dire of some of the prospective jurors. After jury selec-
tion was completed, but before the jury was sworn in,
the state chose not to proceed with the [second] case.
The defendant then moved to dismiss the jury and to
select a new one, arguing that the jury's knowledge of
the defendant's other charges would be overly prejudi-
cial to him." Id. "As a preliminary matter, we note that
if the jury had been sworn in when the state dropped
the [charges in the second case], a motion for a mistrial
would have been the appropriate vehicle for the defen-
dant to raise this challenge." Id., 471; see Practice Book
§ 42-43.[7]

The defendant's motion in this case was something
akin to an objection to an evidentiary ruling, wherein
the defendant requested that information placed before
the jury be stricken and the court refused to do so.[8]
Here, the defendant sought to have the court instruct
the jury to disregard certain information that he deemed
inappropriate or prejudicial. In that light, we shall
review this claim as if it were an objection to an eviden-
tiary ruling. "It is a well established principle of law
that the trial court may exercise its discretion with
regard to evidentiary rulings, and the trial court's rulings
will not be disturbed on appellate review absent abuse
of that discretion. . . . Sound discretion, by definition,
means a discretion that is not exercised arbitrarily or
wilfully, but with regard to what is right and equitable
under the circumstances and the law . . . . And [it]
requires a knowledge and understanding of the material

---

[7] Practice Book § 42-43 provides in relevant part: "Upon motion of a
defendant, the judicial authority may declare a mistrial at any time during
the trial if there occurs during the trial an error or legal defect in the
proceedings, or any conduct inside or outside the courtroom which results
in substantial and irreparable prejudice to the defendant's case. . . ."

[8] Our analysis here is not intended to imply that information given to the
jury during voir dire is testimony or evidence of any kind.

circumstances surrounding the matter . . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *New London Federal Savings Bank* v. *Tucciarone*, 48 Conn. App. 89, 92, 709 A.2d 14 (1998).

We determine, therefore, that the court did not abuse its discretion in this instance. The court chose not to call any additional attention to the nolled case, in its decision to merely state to the jury, "One of [the] incidences will no longer be before you."[9] "The jury, in the absence of a fair indication to the contrary, is presumed to have followed the instructions of the court. *State* v. *Washington*, 182 Conn. 419, 429, 438 A.2d 1144 (1980); *State* v. *Barber*, 173 Conn. 153, [156–57], 376 A.2d 1108 (1977)." *State* v. *Glenn*, 194 Conn. 483, 497, 481 A.2d 741 (1984). In this case, the court clearly instructed the jury that it was not to take evidence of one case and add it to evidence in another case in order to conclude guilt beyond a reasonable doubt. With this clear instruction, the jury would not be inclined, first, to surmise that the defendant was guilty of the September 11, 1995 robbery, and then, even if it did, to use such information improperly against the defendant in the other case.

## C

The defendant next claims that the court improperly refused to allow him to make any reference in final

---

[9] The court stated in relevant part: "Now, I think I indicated to you at the time of the voir dire that the state was bringing three charges pertaining to three separate incidences against the defendant. One of those incidences will no longer be before you. The state has amended its information, and at the conclusion of this trial I will give you copies of the information, which contains the counts in which they allege the crimes. But what we will have before us is the incident of August 30 pertaining to the business known as the Bedding Barn in Newington, and we will have before us the incident of September 13, also the Bedding Barn but in the town of Southington."

argument to the jury about the fact that there were initially three cases being brought against him, thereby violating his right to effective assistance of counsel under the sixth amendment to the United States constitution, and his right to be heard by himself and by counsel under article first, § 8, of the constitution of Connecticut. We disagree.

"Counsel may comment upon facts properly in evidence and upon *reasonable* inferences to be drawn from them. *State* v. *Kinsey*, 173 Conn. 344, 348, 377 A.2d 1095 (1977). Counsel may not, however, comment on or suggest an inference from facts not in evidence. *State* v. *Manley*, 195 Conn. 567, 580, 489 A.2d 1024 (1985). In general, the scope of final argument lies within the sound discretion of the court; *Schwarz* v. *Waterbury Public Market, Inc.*, 6 Conn. App. 429, 437, 505 A.2d 1272 (1986); subject to appropriate constitutional limitations. *Herring* v. *New York*, 422 U.S. 853, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975) (complete denial of right to argue violates sixth amendment). . . . *State* v. *Huff*, 10 Conn. App. 330, 523 A.2d 906, cert. denied, 203 Conn. 809, 525 A.2d 523 (1987)." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ross*, 18 Conn. App. 423, 432, 558 A.2d 1015 (1989).

As discussed in part II B of this opinion, the court in this case appropriately decided not to indicate to the jury the disposition of the charges relative to the September 11, 1995 incident. Furthermore, there were no facts in evidence relating to that case that the defendant could comment on to the jury or suggest inferences from. Therefore, the court did not abuse its discretion when it denied his request to refer to the September 11, 1995 case in closing argument to the jury.

### III

The defendant next claims that the state failed to present sufficient evidence to support his conviction

for two counts of criminal possession of a pistol or revolver pursuant to § 53a-217c because it failed to prove the allegedly essential element of the operability of the weapon. The defendant further claims that the court improperly denied his request to charge the jury that operability was an essential element of the offense that the state had to prove before he could be convicted. We disagree.

We first look to the applicable statutes to determine the elements of the crime. Section 53a-217c (a) provides in relevant part: "A person is guilty of criminal possession of a pistol or revolver when he possesses a pistol or revolver, as defined in [General Statutes §] 29-27, and (1) has been convicted of a felony . . . ." General Statutes § 29-27 provides: "The term 'pistol' and the term 'revolver', as used in sections 29-28 to 29-38, inclusive, mean any firearm having a barrel less than twelve inches in length." There is nothing in either § 53a-217c or § 29-27 that suggests that the operability of the pistol or revolver is an element of the offense.

The defendant seeks to apply the definition of "firearm" provided in General Statutes § 53a-3 (19) to the term "firearm" used to describe a pistol or revolver in § 29-27. Section 53a-3 (19) defines a "firearm" as "any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged . . . ." We disagree with the defendant's contention that we must apply the definition of "firearm" to modify the definition of pistol or revolver under § 29-27.

Our Supreme Court refused to apply the definition of the term "firearm" in § 53a-3 (19) to modify the term "firearm," as defined by § 29-27, in a case involving a conviction under General Statutes § 29-38 in which the defendant claimed that operability was an element of the crime that the state had failed to prove. *State* v.

*Delossantos*, 211 Conn. 258, 272–76, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989). Although *Delossantos* involved a prosecution under § 29-38, the rationale used in reaching the decision not to import a definition from the Penal Code is instructive.

The defendant's rationale appears to be based on the premise that because he was prosecuted under our Penal Code, all definitions provided under the code must apply. This is not the case. First, we note that in § 53a-217c, our legislature specifically sought to apply the definition of "pistol" or "revolver," "as defined in § 29-27." Section "53a-3 (18) defines 'pistol' or 'revolver' as 'any firearm having a barrel less than twelve inches.' This language is identical to that in § 29-27, the section expressly defining 'revolver' as used in [§ 53a-217c]. If the definition of 'revolver' applicable to [§ 53a-217c] were subject to penal code definitions, § 29-27 would be superfluous, since § 53a-3 (18) provides the same definition. Such an interpretation undercuts the established principle that ' "[n]o part of a legislative enactment is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase . . . ." ' *DeFonce Construction Corporation* v. *State*, 198 Conn. 185, 187, 501 A.2d 745 (1985)." *State* v. *Delossantos*, supra, 211 Conn. 274.

The defendant cites *State* v. *Bradley*, 39 Conn. App. 82, 90, 663 A.2d 1100 (1995), cert. denied, 236 Conn. 901, 670 A.2d 322 (1996), and *State* v. *Rogers*, 50 Conn. App. 467, 475, 718 A.2d 985, cert. denied, 247 Conn. 942, 723 A.2d 319 (1998), for the proposition that operability is an essential element for conviction of criminal possession of a *firearm*, for which the state has the burden of proof. Although it is true that this court required the state prove operability in those cases, the defendant's argument is flawed because he was charged with possession of a "pistol" or "revolver" under § 53a-217c, not

possession of a *firearm* under § 53a-217, as was the case in *Bradley* and *Rogers*.[10] We determine, therefore, that operability is not an essential element of the offense under § 53a-217c.

Because we decide that operability is not an essential element of § 53a-217c, we need not address the defendant's remaining claims that the court improperly denied his request to charge the jury relative to the operability of the weapon and that it was the state's burden to prove operability before he could be convicted.

## IV

The defendant next claims that the court improperly failed to charge the jury that it should give no greater or lesser weight to the testimony of police officers on account of their occupational status and improperly charged the jury regarding expert testimony, where police officers were the only witnesses to whom the instruction about expert witnesses could apply. The defendant asserts that when these claims are considered together, they demonstrate that he was prejudiced because the officers' testimony concerned the sole disputed issue at trial, identity.

"Our analysis begins with a well established standard of review. When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather

---

[10] The distinction between these two statutes, although subtle, is not insignificant. Section 53a-217 requires possession of a "firearm," the definition for which we turn to the Penal Code, General Statutes § 53a-3 (19). Section 53a-217c, however, requires the possession of a "pistol" or "revolver" as defined in General Statutes § 29-27. As previously stated, the legislature's decision to reference a definition outside the Penal Code indicates that it intended that "pistol" or "revolver" not be further defined under the code's definition of "firearm," notwithstanding the fact that the definition in § 29-27 includes the word "firearm." This is especially evident because the code provides a definition for "pistol" and "revolver" that is essentially identical to that in § 29-27.

than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . [this court] will not view the instructions as improper. . . . *State* v. *Denby*, 235 Conn. 477, 484–85, 668 A.2d 682 (1995). . . . *State* v. *Delgado*, 247 Conn. 616, 625, 725 A.2d 306 (1999)." (Internal quotation marks omitted.) *State* v. *Whitley*, 53 Conn. App. 414, 423, 730 A.2d 1212 (1999).

The defendant's claim that the court failed to give a charge to the jury instructing it not to give additional weight to police officers' testimony is without merit. First, we note that during the preliminary instructions to the prospective jury panels, the court did specifically instruct the members of each jury panel not to give additional weight to the testimony of police officers based solely on their occupation.[11]

[11] Before jury selection on September 26, 1997, the court addressed the panel in relevant part as follows: "Now, the fact that a police officer testifies or some so-called expert testifies, you should not believe a witness because of the status of the witness. You should believe a witness based on the credibility you ascribe to that witness, just as you would any other witness.

"Now, if a witness comes to you well trained and schooled, and he indicated and had an opportunity to support, that is, by viewing or gathering evidence, to support what that witness is saying to you, then clearly if you wish to ascribe credibility to that witness, you can, but you should not have a knee-jerk reaction because somebody is a doctor or somebody is a lawyer or somebody is a police officer that we automatically have to believe everything that person says because even ten bishops, if they were testifying before you, could be mistaken in terms of whether the traffic light was red or green."

Before jury selection on October 1, 1997, the court addressed the panel in relevant part as follows: "Now, police officers will testify. They don't come from another planet. Just like expert witnesses, they are just like you and I, and your primary function basically is bring common sense. That is why we like lay jurors, a cross section of the community to evaluate every witness, including a police officer, just like you would any other person, just like evaluating your neighbors, your children, your fellow employees, your colleagues. Sometimes, their story seems to make sense; sometimes

The defendant also claims that the court's instruction regarding expert witnesses[12] was prejudicial because other than lay eyewitnesses the only other witnesses to testify were police officers. The defendant asserts that when this claim is considered with his claim that the court failed to give an instruction on the weight to be accorded to the testimony of police officers, it demonstrates that he was prejudiced because the testimony of the officers concerned the sole disputed issue at trial, identity.

As previously discussed, we disagree with the defendant's contention that the jury was not charged regarding police testimony. The court explained to counsel, and we agree, that "if the jury felt that there were no experts—but this [instruction] doesn't say police officer is an expert, and it doesn't reference any—and if they determine that Detective Fournier is not an expert, that's fine." The court further stated to counsel that "[i]t is of no harm whatsoever, and if [the jury] determines that [Fournier] is an expert in the sense that [he] set up these special photographs and that is beyond the ken of an ordinary person—and even a weak argument would suffice to conclude that it does take a trained person to set up a composite—then, to your advantage I have said it is not binding upon you and you can reject it."

it's coherent. You can accept all of it, reject all of it, accept part of it or reject a part of it, but don't start with any jerk reaction because what comes out of a police officer's mouth is necessarily accurate."

[12] The court charged in relevant part: "Now, additionally, there was presented to you several expert witnesses. A person with special knowledge, skill, experience, training or education is qualified to testify as an expert on the subject to which his testimony relates. An expert is permitted not only to testify as to facts which he personally observed, but also presented to assist you in your deliberations. It is not binding upon you, and you may disregard such testimony either in whole or in part. It is for you to consider this testimony with the other circumstances in the case and decide what weight, if any, you will ascribe to it. Although all expert testimony and evidence should be considered by you, it is not as with the nonexpert testimony and evidence controlled upon your judgments."

Because we review the jury charge in its entirety, we conclude that the charge as a whole fairly presented the case to the jury. First, the court gave specific instructions during the jury selection process on the weight to be given to the testimony of police officers. Second, in its final jury charge, the court instructed that the jury was to assess the credibility of witnesses, and that it was free to decide which witnesses to believe and which to disbelieve. The court explained a number of factors that the jury might use to aid in its assessment of witness credibility, including the ability of the witness to see or hear or know that which the witness testified about. Finally, assuming arguendo that an expert witness charge was unnecessary, the charge given did not instruct the jury to give any greater weight or attention to the witness or witnesses to whom it would apply. The court in fact stated that the jury could wholly disregard the testimony if it wanted to do so. Therefore, if the instruction, as the defendant claims, is applied to the police officers by default, it gives their testimony no special sanctity. We therefore hold that the jury instructions as a whole did not mislead the jury or prejudice the defendant.

The judgments are affirmed.

In this opinion the other judges concurred.